ELIZABETH KANE et al.

*v.*

DANIEL LODOR, receiver, &c.

[Filed December 6th, 1897.]

1. A chattel mortgage is good, though the affidavit is defective, as against the receiver of the mortgagor.

2. In an action to foreclose a chattel mortgage given by a corporation and assigned to complainants, it was no defence that complainants were indebted to the company for the money with which it was to commence business.

3. A chattel mortgage by a corporation, authorized by *de facto* stockholders only, is good as to third persons.

4. A chattel mortgage given by a mercantile corporation was not invalidated, as to it or other creditors, by the fact that it was delivered to the attorney of the lessor of the premises in which the company did business, in pledge, to carry out an agreement by which the lien of such mortgage was to be subordinated to the lien of a new mortgage made to such landlord for rent.

5. The lien of a chattel mortgage of a retail stock of goods at the time of enforcement rests only on the goods in stock at the time the mortgage was executed.

6. Where sellers of mortgaged personalty covenant "to warrant and defend the sale against all and every person whatsoever," and the mortgage is subsequently assigned to them, they are estopped to enforce it.

This bill is filed to foreclose a chattel mortgage. The order of events relating to the creation of this instrument, its ownership by the present complainant and the *status* of the present defendant is this : A number of years since, Patrick McGinley, Peter Kane and Elizabeth Donahue were conducting a dry goods business in Trenton under the name of McGinley & Company. While still in business under the name of McGinley & Company, that firm gave a chattel mortgage to Hood, Foulkrod & Company to secure the sum of $4,200. It gave another chattel mortgage to Crissman Brothers to secure $13,530.26, still another chattel mortgage to Mr. Vroom to secure $500, still another to Mr. Holt to secure $600, and another to Cook

Kane v. Lodor.

Brothers to secure $2,000, which they owed for rent of the business premises. Besides these mortgages there were two judgments against McGinley & Company, one for $363.72 and another for $93.30.

On March 18th, 1895, the Capital Dry Goods Company was organized. This company was formed by Edward Kelly, Patrick McGinley and Peter Kane. Mr. Kelly, for his interest in the new company, took one hundred and eighteen of the one hundred and twenty shares, one each of the two remaining shares being held by McGinley and Kane. The capital stock of the company was stated in its certificate of incorporation to be $25,000 and the amount with which they would commence business was stated to be $6,000. The property with which they actually commenced business had its origin in this way: Besides the mortgages upon the stock of McGinley & Company, as I have already remarked, there were two judgments amounting to about $457. Executions were issued upon these judgments, and under these writs the equity of redemption of McGinley & Company in the stock of goods was sold and was bought in by Mr. Holt, who was at that time the attorney of McGinley & Company, for the sum of $50. Mr. Holt sold this right to Edward Kelly, father of Mrs. Kane, the wife of Peter Kane, for the sum of $200. Then, as already remarked, the Capital Dry Goods Company was organized, and Edward Kelly sold his interest to the company for the express consideration of $1 and other good and valuable consideration. What he got was the one hundred and eighteen shares of stock in the new company. So, when the Capital Dry Goods Company commenced business its capital really consisted of the equity in the goods covered by the various mortgages, which equity had been bought for $50 and conveyed to the new-fledged corporation. After the organization of the corporation it substituted its own mortgages for the mortgages made by McGinley & Company. It gave on August 19th, 1895, a mortgage for $4,000 to Hood, Foulkrod & Company, one for $600 to Mr. Vroom and one for $600 to Mr. Holt. Before the close of the year the Capital Dry Goods Company was transferred into the Trenton Dry

Goods Company, the insolvent corporation whose receiver is the present defendant.

The certificate of incorporation of the last company is dated September 30th, 1895, its capital stock is stated to be $50,000, the number of shares two thousand, of the par value of $25 each, and the amount with which the company would commence business was stated to be $3,000. The stockholders were Patrick McGinley, one share; Peter Kane, one share; Patrick Mohan, twenty shares; Elizabeth Kane, forty-nine shares, and Margaret Dorian, forty-nine shares. The shares of Mrs. Kane and Miss Dorian appear to have been paid for in the following manner: On October 19th, 1895, the Capital Dry Goods Company, the previous company, executed a bill of sale of its goods and chattels to these ladies for the consideration of $3,000. On the same day these ladies, for the same express consideration, sold the same chattels to the Trenton Dry Goods Company.

Patrick Mohan paid for his in this way: He had loaned about $800 to the Capital Dry Goods Company, and in payment had received a lot of goods which he stored. After the Trenton Dry Goods Company was formed, he let the company have those goods and received twenty shares of stock. The new corporation was practically a continuation of the business of the old company, with the same stock of goods, except so far as it had been changed by purchases and sales made during the period of time from March 18th, 1895, to September 23d, 1895. There was upon the property the $4,000 mortgage of Hood, Foulkrod & Company, the Vroom and Holt mortgages, and on October 19th, 1895, the company gave a mortgage to Edward G. Cook and others to secure $1,575 for rent due.

The mortgage which the complainants are foreclosing is the $4,000 mortgage originally made to Hood, Foulkrod & Company. The complainant became possessed of it in this way: In the latter part of 1896, Mr. Kane approached Mr. Thomas R. Allen, and told him that Hood, Foulkrod & Company were pressing for the payment of their mortgage, and insisted that Mr. Allen should take it, saying that he could buy it for $2,000 or a little less, and that the company would pay it off within a

year.   Mr. Allen bought it.   On February 20th, 1897, he assigned it to Elizabeth Kane and Margaret Dorian, taking seven houses, four on Princeton avenue and three on South Broad street, subject to mortgage.

The property in these houses originated, according to the testimony of Miss Dorian, in this way : McGinley, her uncle, gave her a house on Prospect street ; that house was traded for stock in a shoe store; that stock was traded on August 16th, 1895, for a farm, and the farm was traded for the houses conveyed to Mr. Allen.

*Mr. James L. Kelly* and *Mr. Woodbury D. Holt*, for the complainants.

*Mr. James L. Conard*, for the defendant.

REED, V. C.

The defendant sets up, among other things, that the affidavit to the chattel mortgage is defective.   But as against the receiver, who was the only party defendant, the mortgage is good without registry or affidavit.

The mortgage, as against the mortgagor, was entirely efficacious as an encumbrance, and the receiver took his title to the property subject to all the equities to which it was subject in the hands of the debtor.

This rule was asserted in respect to an assignment for the benefit of creditors in the case of *Shaw* v. *Glenn, 10 Stew. Eq. 32*.   A receiver, in this respect, stands upon the same footing as an assignee for the benefit of creditors.

It is also set up that the complainants were indebted to the insolvent corporation in the sum of $3,000 cash with which the corporation was to commence business, when, in fact, it had nothing but the equity of redemption in the mortgaged goods, coupled with the fact that the complainants were the real stockholders, and that they did not make any cash payments.   But this, if true, is no defence to the mortgage.   If there is any right

to assert a claim against the complainants upon this ground, it must be done by another suit.

It is again asserted that this mortgage was executed without corporate authority, and that those who executed it were not *bona fide* stockholders ; they were, however, *de facto* stockholders, whose official acts were valid as to third persons.

It is again asserted that these mortgages were delivered to the attorney of the landlord from whom it rented the premises in which it conducted its business, to be canceled. The evidence shows that the delivery was only for the purpose of putting the mortgage in pledge to carry out an agreement by which the lien of this mortgage was to be subordinated to the lien of a new mortgage made to such landlord for rent. The transaction did not invalidate the mortgage so far as it stood against the company or against other creditors.

It is asserted that other mortgages have been made to other parties. This appears to be so. The evidence shows the existence of several other mortgages upon the property. The mortgagees are not parties to the bill, but the result of the existence of such other mortgages, if still unpaid, would be that a decree in favor of the complainant in this suit will settle nothing as against the lien of any other mortgagees.

The question of priority will remain open, to be settled by another suit or upon a proceeding taken to distribute the assets in the hands of the receiver resulting from a sale of the property already made by order of this court.

The troublesome questions in the case are two. The first rests upon the defence set up that the goods sold by the receiver were purchased by the company after the execution of the mortgage, and are not subject to the lien of that instrument. The facts upon which this insistence rests are these : The mortgage was executed on August 19th, 1895, at the time of the organization of the Capital Dry Goods Company. The mortgage covered the goods then in possession of the company. That company went on using those goods in its business of retailers until September 30th following, when what was left of the goods passed to the Trenton Dry Goods Company, the insolvent corporation.

This corporation continued the business until December 26th, 1896, when it went into the hands of a receiver. The lien of the mortgage, of course, rested at that time upon those goods only which had been in stock on August 19th, 1895. Now, what remained of the original stock after sixteen months of retailing is a question almost impossible to solve. The receiver had already sold a considerable portion of the stock before any claim was put in by the mortgagee, and thereafter no effort was made to identify the old from the new stock. The stock, of course, was replenished from time to time in the usual course of business. That some of the original stock remained at the time of the assumption of possession by the receiver I have no doubt; but, in my judgment, the proportion in value of the old stock to the whole stock was very small. The value of the entire stock, as shown by the inventory and by the receiver's sale, was, at the time of the company's insolvency, much less than the estimate put upon it by the officers of the company. In fixing upon any figure as the value of the old stock still remaining at the time of the company's insolvency the effort would be a mere guess. Whether the complainants, who have upon them the burden of showing the extent of their lien, should have a decree at all for any amount is doubtful. I should be inclined, however, to make an estimate of the proportion of the proceeds to which, as against the receiver, a decree should go if it were not for another feature of the case which, in my judgment, precludes them from any decree. This feature consists of a collocation of facts as follows: In the bill of sale executed by the complainants to the Trenton Dry Goods Company on October 19th, 1895, there is this warranty: "We covenant and agree to warrant and defend the sale against all and every person whatsoever." This, it is perceived, was a general warranty of title. There was then outstanding this Hood, Foulkrod & Company mortgage.

On February 20th, 1897, the complainants purchased this mortgage. The rule is entirely settled in regard to sales of real estate, that if the sale is accompanied by a general warranty of title, then any title afterwards acquired by the grantor passes directly to the grantee. The rule rests upon the doctrine of

Kane *v.* Lodor.

estoppel, which shuts off the vendor, who has warranted a clear title, from asserting a claim against the title which he conveyed and warranted. *Gough* v. *Bell, 1 Zab. 157; Moore* v. *Rake, 2 Dutch. 574; Brundred* v. *Walker, 1 Beas. 140; Vreeland* v. *Blauvelt, 8 C. E. Gr. 483; Sugar Refinery Co.* v. *Mayor of Jersey City, 11 C. E. Gr. 247.*

In respect to sales of personal property, it has been held that, without any express warranty of title, the same result follows as in cases of the covenant of warranty in the sale of real estate. The sale of personalty by a person in possession, and in England by anyone, whether in possession or not, carries with it an implied warranty that the vendor has the right to sell.

In this respect such sales differ from sales of real estate by a deed of bargain and sale, for such a deed includes no implied warranty of title. *Phillips et al.* v. *Mayor and Common Council of Hudson, 2 Vr. 143; Gano* v. *Vanderveer, 5 Vr. 293.*

In sales of personalty, therefore, it has been held, and I think rightly, that, without an express covenant of warranty, a title afterwards acquired by vendor in property which he has sold, passes to his grantee. *Littlefield* v. *Perry, 21 Wall. 205; Gottfried* v. *Miller, 104 U. S. 521; Curren* v. *Burdsall, 20 Fed. Rep. 835; Frazer* v. *Hilliard, 2 Strobh. 309.*

Although the rule was criticised by the American editors of the Duchess of Kingston case, on the ground that it was an evasion of the rule that no interest can pass either in land or chattels which is not vested at the time of the sale (*2 Sm. Lead. Cas. *742*), yet a court of equity constantly recognizes the validity of a sale of future-acquired property. Such a contract transfers the beneficial interest in the property, as soon as it is acquired, to the vendee or mortgagee, who may have an injunction to restrain any interference with the property. *Holroyd* v. *Marshall, 10 H. L. Cas. 191.*

Where there is, as in this case, an express warranty of title, the criticism just referred to, if sound, would explode the entire doctrine of title by estoppel in sale of both real and personal property. The rule in respect to real property is settled by an overwhelming weight of authority in respect to sales of all kinds;

and Mr. Bigelow remarks that "it may be considered that the weight of authority is in favor of the estoppel whenever there is a sufficient warranty or recital."

Upon this ground the moment that the mortgagee's title passed to the present complainants, that title, by force of their general warranty to the Trenton Dry Goods Company, passed by the doctrine of estoppel to the latter company, and so to the receiver.