WEIPRECHT *v.* RIPPLE ET AL.

[No. 260, September Term, 1957.]

*Decided June 18, 1958.*

The cause was argued before Brunÿ, C. J., and Hÿnderson, Hammond, Prescott and Horney, JJ.

*Harry E. Taylor, Jr.,* with whom were *Taylor & Waldron* on the brief, for the appellant.

342

H. *Winship Wheatley, Jr.*, for Guy, Curran & Co., Inc.

*Anne S. Musgrave* for United States Rubber Co.

No brief and no appearance for the mortgagors or for the other claimants.

HORNEY, J., delivered the opinion of the Court.

This is an appeal from the final ratification by the Circuit Court for Prince George's County of the audit of the proceeds of certain fixtures and stock of merchandise sold under a chattel mortgage.

On May 4, 1954, Robert R. Ripple and Betty S., his wife (the Ripples *or* mortgagors), executed a purchase money chattel mortgage to Fred J. Weiprecht (Weiprecht *or* mortgagee), for the sum of $15,000 on the haberdashery business, known as the "Town and Country Shop, Clinton, Maryland," sold by the latter to the former. By the chattel mortgage the Ripples "bargained and sold" to Weiprecht the equipment and fixtures, valued at approximately $5,300 to $5,500, and the "merchandise and stock [of the] approximate value of $26,000 to $28,000." No specific reference was made in the mortgage to an after-acquired stock of merchandise. On the same day the parties entered into a separate agreement—not mentioned in the mortgage—providing that the mortgagors should "maintain stock and equipment in the store sufficient to cover the balance due on the mortgage and note." Neither the mortgage nor the separate agreement expressly provided that the stock of merchandise—presently owned or thereafter acquired —should be subject to a lien, but the mortgage did contain a clause assenting to a decree for the sale of the mortgaged property in the event of a default. The mortgage was duly recorded on May 7, 1954, but the separate agreement was never recorded.

By September of 1956, the mortgagors were in default with respect to the payments specified in the mortgage, whereupon the mortgagee filed a bill of complaint seeking an injunction prohibiting the mortgagors from continuing to conduct the business and the appointment of a trustee to sell the assets. The court granted the injunction and appointed a trustee to

sell under the terms of the mortgage upon the filing of bond. Subsequently all of the assets were sold, and, by direction of the court, the proceeds of sale, after deduction of the auctioneer's charges, were divided into two accounts: one representing the proceeds of the fixtures, and the other representing the proceeds of the merchandise. Thereafter the trustee gave notice to all of the creditors of the Ripples to file their claims with the clerk of court. The mortgagee, who believed it was unnecessary for him to file another claim since a copy of his chattel mortgage and an affidavit of default had been filed with the bill which initiated the foreclosure proceeding, failed to file with the clerk the "properly authenticated" claim contemplated by the notice to creditors.

The auditor's report and account allowed the entire net proceeds from the sale of the fixtures to the mortgagee, but disallowed his claim as a secured creditor entitled to the proceeds of the sale of the merchandise, and subordinated the mortgagee's resulting claim as a general creditor to the claims of all of the other creditors. After the deduction for administration costs and expenses, there remained for distribution the sum of $4,631.42 from the sale of the merchandise. Except for the claim of the mortgagee, all creditors were allowed payment in full of their claims aggregating $4,520.17. The mortgagee was allowed the balance of $111.25 on account of his original claim of over $10,000. Once the auditor had determined that the mortgagee's claim should be subordinated to the claims of all other creditors, it was unnecessary for him to allow any "preferred" claims; nevertheless he allowed, as priorities, the judgment claim of the Clinton Bank for the balance due it after the foreclosure of its lien against the real estate of the Ripples, as well as the tax claims of the United States and the State of Maryland. The mortgagee filed "objections" to the auditor's report and account—he particularly excepted to the allowance in full of the claims of the general creditors, the tax claims and the so-called "preferred" claim of the bank—but his exceptions were overruled, and he appealed.

The mortgagee's right to the proceeds from the sale of the

fixtures was conceded.[1]  The principal controversy arises from the refusal of the mortgagee to accept the subordination of his claim to the claims of all the other general creditors.  His argument, however, is tripartite:  (i) since he had a valid lien on the after-acquired merchandise, he was a secured creditor entitled to distribution of the net proceeds of sale ahead of the general creditors; (ii) even if his lien were not valid, he should have shared pro rata as a general creditor; and (iii) if he is entitled to share as a general creditor, the tax claims of the taxing authorities and the judgment claim of the Clinton Bank are not entitled to priorities, and the judgment claim of Guy, Curran & Company and the general creditor claims of the United States Rubber Company and other general creditors are not entitled to be paid in full.

In this Court, the only appearances made in opposition to Weiprecht, were by Guy, Curran & Company and the United States Rubber Company.  It is their contention that (i) Weiprecht did not have a valid lien on the after-acquired merchandise, and (ii) he is not entitled to share as a general creditor because he failed to file his claim as a general creditor pursuant to the notice to creditors.

### (i)  After-Acquired  Merchandise.

The mortgagee contends that, even though the mortgage did not specifically refer to after-acquired merchandise, a person dealing with the mortgagors would know or—since the chattel mortgage was recorded—should have known that the stock would continually have to be replaced with new merchandise, and therefore the mortgage impliedly covered the after-acquired merchandise.  Apparently there is a lay belief that mortgages of stock-in-trade necessarily include after-acquired merchandise, but the courts have universally rejected this theory.

This Court has held repeatedly that a chattel mortgage which provides that after-acquired merchandise shall be sub-

---

1. The undisputed judgment claim of the International Shoe Company was allowed out of the proceeds of the sale of the real estate in another proceeding, thus, there is no need to discuss this matter further herein.

stituted for the original stock of merchandise, although not void as fraudulent, is a nullity *at law. Hamilton v. Rogers,* 8 Md. 301 (1855) ; *Rose v. Bevan,* 10 Md. 466 (1857) ; *Wilson v. Wilson,* 37 Md. 1 (1872) ; *Crocker v. Hopps,* 78 Md. 260, 28 A. 99 (1893) ; *First National Bank v. Lindenstruth,* 79 Md. 136, 28 A. 807 (1894).[2] But it has also been held that a similar provision in a mortgage is valid and enforceable *in equity* under some circumstances. *Butler v. Rahm,* 46 Md. 541 (1877) ; *First National Bank v. Lindenstruth, supra.* Thus it appears that the law on this question is not as clear and settled in Maryland as might be desired. But apparently other jurisdictions have had difficulty with the same problem.[3]

As stated, the mortgagee earnestly contends—in fact, he devoted nearly the whole of his brief and oral argument to the question—that he had an equitable lien on the after-acquired merchandise. However, it is clear that we do not reach the question he has stressed for the simple reason that there is no mention whatever in the chattel mortgage of after-acquired property to which a *lien* of any sort could have attached. Generally, if the mortgage fails to specify an intention to create a lien on after-acquired merchandise, no lien will arise. Or, stated conversely, if there is an intention that after-acquired merchandise shall "feed the lien" of the mortgage, a specific provision to that effect must be included in the mortgage. See Cohen and Gerber, "Mortgages of Merchandise," 39 Colum. L. Rev. 1338, 1350-51 (1939). Cases in other jurisdictions stating this rule include: *Snow v. Cody,* 96 Okla. 81, 220 P. 578 (1923) ; *In re Thompson,* 164 Iowa 20, 145 N. W. 76 (1914) ; *Ryan v. Rogers,* 14 Idaho 309, 94 P. 427 (1908) ; *Godfrey & Sons Co. v. Citizens' Nat. Bank,* 64 Neb. 477, 90 N. W. 239 (1902) ; *Bergman v. Jones,* 10 N. D. 520, 88 N. W.

---

**2.** On the subject of fraudulent and void chattel mortgages generally, see 2 *Glenn, Fraudulent Conveyances and Preferences* (Rev. ed. 1940) §§ 565-94; 4 *Collier, Bankruptcy* (14th ed. 1942) § 70.77; Cohen and Gerber, "Mortgages of Merchandise," 39 *Colum. L. Rev.* 1338 (1939).

**3.** See Arnold, "The 1950 Amendment to the Preference Section of the Bankruptcy Act and Maryland Law," 14 *Md. L. Rev.* 311, 328 (1954).

284 (1901); *Kane v. Lodor,* 56 N. J. Eq. 268, 38 A. 966
(1897); *Pinkstaff v. Cochran,* 58 Ill. App. 72 (1894); *Wilcox
v. Jackson,* 7 Colo. 521, 4 P. 966 (1884); *People v. Bristol,*
35 Mich. 28 (1876); *Partridge v. White,* 59 Me. 564 (1871);
and see additional cases cited in 1 *Jones, Chattel Mortgages
and Conditional Sales* (6th ed. 1933), § 173a.

In the pleadings, the mortgagors stated that all of the orig-
inal stock of merchandise had been sold by them, "except for
a very few items." Since the mortgagee did not offer any
proof to the contrary or otherwise rebut this fact, it must be
presumed that he waived whatever rights he may have had as a
*secured* creditor to the proceeds of the sale of such part of the
original stock of merchandise as remained unsold by the mort-
gagors.

### (ii). Mortgagee as a General Creditor.

There was no excuse for the mortgagee not filing with the
clerk of court a statement of his claim, properly authenticated,
showing the balance due him under the chattel mortgage, which
was required of *all* creditors by the preceding notice to credi-
tors. But, under the circumstances in this case, there was no
reason why the auditor should not have allowed the mortgagee,
as a general creditor, his *pro rata* share of the amount due him
under his mortgage from the net proceeds of the sale of the
merchandise. See *Rogers, Brown & Co. v. Citizens' National
Bank, infra.* The auditor must have known that the mortgagee
had filed his mortgage and an affidavit of default with the bill
of complaint when this proceeding was originally instituted.
He also knew, or could easily have ascertained, that the net
proceeds from the sale of the fixtures would not pay in full
the debt due the mortgagee. The law contemplates that all
claims having any probable validity, or which may ultimately
be sustained by proof, shall be stated as of course. *Dorsey v.
Hammond,* 1 Bland Ch. 463, 470 (1828); *Williamson
v. Wilson,* 1 Bland Ch. 418, 440-1 (1827). See also
*Miller, Equity Procedure,* § 543. As a general rule the auditor
should notice all claims which have been filed. *Winn v. Albert,*
2 Md. Ch. 169, 177-8 (1851). In *Hignutt v. Garey,* 62 Md.
190, 192-3 (1884), the lack of the usual proof was obviated
by peculiar circumstances. See also *Davis v. Gemmell,* 73 Md.

530, 546-7, 21 A. 712 (1891), in which claims were rejected for lack of proof. Furthermore, the auditor had authority to take, and there was no reason why he should not have taken, proof of the claim of the mortgagee and of the amount thereof if the auditor deemed it necessary or was uncertain as to the exact amount of the claim. In fact, since the mortgagee's claim was filed with the bill, and on its face appeared to be just and fair, the auditor could have allowed the claim, if he knew or could have ascertained the amount thereof, regardless of whether it had been authenticated or not, and then suspended the payment thereof, and reported that fact in his report to the court. By so doing the auditor would have put the mortgagee on notice of the defect in proof, and afforded him an opportunity to supply whatever might be necessary before the audit was ready for final ratification. See footnote 2 to *Miller, op. cit. supra,* § 543.

### (iii). Priority of Claims.

With regard to the tax priorities, there is no difficulty. The Federal and State statutes are clear. The *Revised Statutes,* § 3466 (1875), 31 *U. S. C.* § 191 (1952), provides in part:

> "Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, * * * is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

Taxes are "debts" within the meaning of this section and are subject to its protection. *Price v. United States,* 269 U. S. 492 (1926). Section 3466, *supra,* creates a priority, not a lien, but the priority does not attach until the debtor has been divested of his property in one of the modes specified in the statute, at which time the person vested with title becomes trustee for the United States and is required to pay its claim

first. *In re Baltimore Pearl Hominy Co.*, 294 F. 921 (D. Md.. 1923), *rev'd on other grounds,* 5 F. 2d 553 (4th Cir. 1925). An important limitation on the scope of the statute is imposed by the meaning of the word "insolvency." The priority of the United States may be invoked, according to the terms of the statute, when the debtor is "insolvent," or whenever the estate of a deceased debtor is "insufficient to pay all the debts. due from the deceased." In *United States v. Oklahoma,* 261 U. S. 253 (1923), the Supreme Court limited the term "in-. solvency," as used in the statute, to an insolvency manifested in one of the three forms set forth in § 3466, *supra*: (i) by voluntary assignment; (ii) by having one's effects attached after absconding, concealing or absenting one's self; or (iii) by committing an act of bankruptcy. Section 3 (a) [5] of the Bankruptcy Act provides that an act of bankruptcy is committed when a person, "while insolvent or unable to pay his debts as they mature, procured, permitted or suffered voluntarily or involuntarily the appointment of a receiver or trustee to take charge of his property * * *." Thus it is clear that the Ripples committed an act of bankruptcy and therefore the statute (§ 3466, *supra*) applies. The appointment of a trustee to take over and liquidate the business of the mortgagors is clearly within the definition of this particular act of bankruptcy. 1 *Collier, Bankruptcy* (14th rev. ed. 1954), § 3.501-3.504. The application of § 3466, *supra,* is not impaired under the facts of this case by §§ 3670-3672 of the *Internal Revenue Code* since the Federal Government had not obtained a lien on the property. *United States v. Levin,* 128 F. Supp. 465 (D. Md. 1955); *Miller v. Bank of America,* 166 F. 2d 415 (9th Cir. 1948).

Code (1951), Art. 81, § 201 (a), [§ 202 (a) in the 1957 Code], provides:

> "Whenever a sale of either real or personal property upon which taxes are due and payable shall be made by any ministerial officer, under judicial process or otherwise, all sums due and in arrears for taxes, upon such property, from the party whose property is sold shall be first paid and satisfied * * *."

This section applies to sales by trustees appointed by a court of equity. *Parlett v. Dugan,* 85 Md. 407, 413, 37 A. 36 (1897). There is nothing in the record to indicate that the State taxes allowed as a "preference" in the audit filed in this case were not due and in arrears. See *Wheeler v. Addison,* 54 Md. 41, 47 (1880). Nor is there any indication that such taxes were barred by limitations. See *Perkins v. Gaither,* 70 Md. 134, 135-6, 16 A. 531 (1889). Therefore, the State taxes were also a priority, second only to Federal taxes. See *United States v. State of Texas,* 314 U. S. 480, 488 (1941). Furthermore, it was proper for the Comptroller to apply to the court for the payment of sales and income taxes due the State of Maryland out of the proceeds of the sales. See *Thompson v. Henderson,* 155 Md. 665, 671, 142 A. 525 (1928).

The Clinton Bank, having obtained a "deficiency" judgment as a result of the foreclosure of its lien against the real estate, filed its judgment claim in this proceeding against the fund to be distributed and thereby became a party herein. *Farmers' Bank v. Thomas,* 37 Md. 246, 257 (1873); *Hall v. Ridgely,* 33 Md. 308, 310 (1870); *Post v. Mackall,* 3 Bland Ch. 486, 498 (1832); *Strike's Case,* 1 Bland Ch. 57, 85 (1828); *Miller, Equity Procedure,* § 538. The auditor allowed the bank's claim as a priority. The precedential allowance was improper. A creditor whose claim was secured by the debtor's property must share *pro rata* with other general creditors after he has exhausted his security. In *Rogers, Brown & Co. v. Citizens' National Bank,* 93 Md. 613, 49 A. 843 (1901), we said at p. 617:

> "[A] creditor is not entitled to a dividend on the full amount of his claim, without deducting therefrom the value of the collateral security. The value of the security so held by the creditor should be credited on the claim before distribution is made and he is then entitled *to share with the general creditors* in the portion remaining, after deducting the amount received from the collateral." (Emphasis added).

See also 28 *Am. Jur., Insolvency,* § 55; *Wheat v. Dingle,* 32

S. C. 473, 11 S. E. 394 (1890). Cf. *National Union Bank v. National Mechanics' Bank,* 80 Md. 371, 30 A. 913 (1895).

Guy, Curran & Company obtained a judgment against the Ripples after the trustee had taken over the assets of the haberdashery. Its claim was allowed in full by the auditor, but not as a priority. The judgment was not entitled to a priority since it had not reached the status of a lien for two reasons: (i) a lien cannot be obtained on property in *custodia legis,* and (ii) no execution was levied on the stock of merchandise. Cf. *Mayor & City Council of Baltimore v. Maryland Trust Co.,* 179 Md. 546, 20 A. 2d 495 (1941), [status of property in *custodia legis*], and *Buckey v. Snouffer,* 10 Md. 149 (1856), [property of insolvent not subject to distress for rent after commencement of insolvency proceeding].

Since the order of court ratifying the audit must be reversed, and the case remanded for further proceedings, the auditor, in restating the report and account of the net proceeds of sale of the merchandise, after deducting the administrative costs and expenses to date, including the costs of this appeal, shall allow the full amount of the tax claims of the Federal and State governments as priorities, and then proceed to distribute the remaining balance *pro rata* among *all* other creditors, including Fred J. Weiprecht, the Clinton Bank, Guy, Curran & Company, and the United States Rubber Company, without preference or priority.

> *Order of court ratifying audit reversed, and case remanded for further proceedings not inconsistent with this opinion, the costs of this appeal to be paid out of the proceeds of sale of the merchandise.*