566 A.2d 1091

**Ellyn L. BROWN et al.**

v.

**David COLEMAN et al.**

**No. 70, Sept. Term, 1988.**

Court of Appeals of Maryland.

Dec. 20, 1989.

58

T. Webster Brenner, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for appellants.

Janet A. Bradley (William S. Rose, Jr., Asst. Atty. Gen., Gary R. Allen, William S. Estabrook, all on brief), Washington, D.C., for appellees.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFF, ADKINS and BLACKWELL, JJ.

ELDRIDGE, Judge.

This case involves competing claims of the United States and the victims of a fraudulent investment scheme for the proceeds from a liquidation sale of the defrauder's assets. The United States asserts that a federal statute entitles its claim to priority. The investors assert that the proceeds are their property because they have sufficiently traced their investments into those proceeds.

I.

David Coleman was the owner of Data Video Concepts, Inc., a Delaware corporation qualified to do business in Maryland, trading under the name of Computer Concepts. Computer Concepts operated several retail outlets for home video equipment, home rental movies, personal computers, and other equipment.

David Coleman was also the president and chief executive officer of Coleman and Associates, an unincorporated business entity which purported to offer financial planning services to the public. From at least January 1, 1983, until July 25, 1983, Coleman and a co-conspirator operated a scheme that resulted in defrauding unknowing investors of more than 1.6 million dollars. Coleman issued "Promissory Notes" and "Certificates of Investment" in non-existent

investment opportunities and guaranteed returns as high as 40% over a three month period. The companies in which the investments were to be made often did not exist, and, when they existed, they had not authorized Coleman to act on their behalf. Coleman took money from early investors and paid some of these investors with funds acquired from later investors. These early payments were made to give the appearance of legitimacy to the investment opportunity and fuel Coleman's scheme, commonly known as a "pyramid" or "Ponzi" scheme.

The certificates and notes issued by Coleman were investment contracts, which are required to be registered with the Securities Commissioner of Maryland. *See* Maryland Code (1975, 1985 Repl.Vol., 1989 Cum.Supp.), §§ 11–101(p)(xi) and 11–501(1) of the Corporations and Associations Article. Coleman did not register them. Learning of Coleman's activity, the Securities Commissioner issued letters to him and to his co-conspirator regarding possible violations of the Maryland Securities Act. On June 30, 1983, the Commissioner issued a subpoena duces tecum and a show cause order.

On July 5, 1983, Coleman fled the state. Using what were described as "large sums of money," Coleman "gambled heavily," placing "large bets" at racetracks in Pennsylvania, New Jersey, and New York. On July 12, 1983, as many of the investments were maturing and coming due, management of Coleman's Computer Concepts stores closed operations because it could not meet the payroll demand. Coleman subsequently returned to the state.

The Commissioner filed a complaint in the Circuit Court for Baltimore County on July 25, 1983, pursuant to Code (1975, 1985 Repl.Vol., 1989 Cum.Supp.), § 11–702 of the Corporations and Associations Article, on behalf of all defrauded investors, seeking, *inter alia*, to enjoin Coleman from engaging in any further fraudulent securities violations and to establish a receivership for Coleman and Associates.

On August 16, 1983, the court issued an order enjoining Coleman from engaging in fraudulent acts and appointing a permanent receiver for all of the "funds, securities, bank accounts and other assets and property of, belonging to, or in the possession of" Coleman and affiliated entities and persons. The receiver was appointed to preserve those assets "for the benefit of the injured Maryland residents who shall hereafter establish claims against" Coleman.

The court-appointed receiver, on August 16, 1983, proceeded to seize Coleman's assets, which included inventory and fixtures from the Computer Concepts stores and corporate headquarters, along with a Mercury Cougar automobile. The receiver sold the automobile to a used car dealer for $9,250.00. A liquidation sale of the inventory and fixtures grossed $235,512.76. Debited by costs of administration and credited by interest and a few further sales, the funds held by the receiver, as of September 1988, approximated $220,000.00.

The State filed a criminal information against Coleman in the Circuit Court for Baltimore County on April 18, 1984. On June 7, 1984, pursuant to a plea agreement, Coleman entered guilty pleas to one count charging securities fraud and one count charging the sale of an unregistered security. According to the statement of facts in support of the pleas, Coleman and his associate received approximately $2,368,762 in funds from approximately 243 investors, of which $670,444 was returned to some early investors. Another $70,890 was paid out in commissions to those who innocently solicited investments on Coleman's behalf. Thus, the profits from the scheme approximated $1,627,428.

A number of claims against the funds held by the receiver were made by, *inter alia,* business creditors and individuals claiming to have invested in Coleman's scheme. The record indicates that the court approved a total of 118 claims from defrauded investors, amounting to $1,167,429.31. The court also concluded that "as much as $200,000" in claims from business creditors was "properly chargeable" against funds held by the receiver.

From August 2, 1985, through October 10, 1985, the United States of America, Internal Revenue Service (IRS), filed in court four Proofs of Claim for taxes, the last of which asserted that Coleman owed the United States $911,-556.03, including penalties and interest. This claim was based on income that should have been reported by Coleman, primarily on the basis that the monies he garnered through fraud constituted federal gross income under section 61 of the Internal Revenue Code, 26 U.S.C. § 61 (1982, Supp. V 1987). *See James v. United States*, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961) (embezzled funds constitute federal gross income, taxable to the embezzler in the year in which the funds are misappropriated); *Cohen v. United States*, 297 F.2d 760, 768–769 (9th Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1029, 8 L.Ed.2d 84 (1962) (money secured by false representation that "lenders" would become part owners of various enterprises, where taxpayer never intended to repay "loans," constitutes taxable income).

The IRS asserted priority over any "distribution to creditors to the extent provided by law," basing its priority on the so-called "federal insolvency statute," 31 U.S.C. § 3713. This claim, far in excess of the funds held by the receiver, would, if granted priority, entirely deplete those funds.[1]

On July 24, 1986, in an attempt to avoid what the State has characterized as an "unjust result," the Securities Commissioner, acting on behalf of the defrauded investors, filed in the action a "Motion for Declaration of Constructive Trust." The Commissioner argued that because David Coleman breached a fiduciary responsibility to the investors by committing a fraud upon them, the funds in the receivership were held in constructive trust for the benefit of the

---

1. Maryland's Comptroller of the Treasury also filed a priority claim for taxes due on income that should have been reported by Coleman. We need not consider this claim, for the IRS claim, which would deplete all the funds in the hands of the receiver, has a clear priority over any state income tax claim. *See* Section II, *infra*. Moreover, the Comptroller is not a party in this appeal.

defrauded investors, and thus were not available to satisfy the IRS claim.[2]

The IRS did not dispute that the investors were defrauded of their money. Rather, the IRS argued that, as a matter of Maryland law, the Commissioner had failed to satisfy the prerequisites for establishing a constructive trust.

The circuit court (Fader, J.), in a written order issued on January 22, 1988, denied the Commissioner's motion, holding that the Commissioner had failed to trace the interest of any investor to the purchase of inventory and fixtures later sold by the receiver. Thus, the IRS was entitled to a priority claim under 31 U.S.C. § 3713.[3]

The Commissioner filed a timely notice of appeal from the circuit court's order.[4] Thereafter, this Court issued a writ of certiorari prior to argument in the Court of Special Appeals. The sole issue on appeal concerns the correctness of the circuit court's holding that the Commissioner failed to trace the interest of any investor to the purchase of assets later sold by the receiver and that,

---

2. The Commissioner also asserted that the IRS had failed to submit satisfactory documentary evidence of its claim, that the claim was filed too late, and that Coleman had no "income" as that term is defined by federal tax law. On July 22, 1986, two days earlier, the receiver had filed exceptions to the claims of the IRS, asserting identical arguments.

The IRS contested the authority of both the receiver and the Commissioner to act in a representative capacity for the defrauded investors. The IRS also asserted that the claims of the receiver and Commissioner were barred by limitations.

3. The court also held that the Commissioner had the authority to act in a representative capacity for the defrauded investors. The court denied the limitations arguments of both the Commissioner and the IRS. The court also concluded that the Commissioner's assertions, that the IRS failed to submit satisfactory documentary evidence of its claim, and that Coleman had no "income" as that term is defined by federal tax laws, were "without merit."

4. The circuit court's interlocutory order was appealable under Maryland Code (1974, 1984 Repl.Vol., 1989 Cum.Supp.), § 12–303(3)(viii) of the Courts and Judicial Proceedings Article.

therefore, the United States claim was entitled to priority. None of the circuit court's other rulings are contested by any party.

## II.

The assertion by the IRS that its claim has priority over other claims to the funds held by the receiver is grounded on the federal insolvency statute, 31 U.S.C. § 3713, which reads in relevant part as follows:

"§ 3713. Priority of Government claims

(a)(1) A claim of the United States Government shall be paid first when—

(A) a person indebted to the Government is insolvent and—

(i) the debtor without enough property to pay all debts makes a voluntary assignment of property;

(ii) property of the debtor, if absent, is attached; or

(iii) an act of bankruptcy is committed...."

This statute, previously codified as 31 U.S.C. § 191, and often referred to as Revised Statutes § 3466 (1875), is derived without significant modification from Section 5 of the Act of March 3, 1797, c. 20, 1 Stat. 515 (1797).[5] *See United States v. Moore,* 423 U.S. 77, 81, 96 S.Ct. 310, 313, 46 L.Ed.2d 219 (1975); *Weiprecht v. Ripple,* 217 Md. 337, 347–348, 143 A.2d 62, 68 (1958); *Mickelson v. Barnet,* 390 Mass. 786, 793, 460 N.E.2d 566, 570 (1984); *Back v. Inter-*

---

5. Section 5 of the Act read:

"*And be it further enacted,* That where any revenue officer, or other person hereafter becoming indebted to the United States, by bond or otherwise, shall become insolvent, or where the estate of any deceased debtor, in the hands of executors or administrators, shall be insufficient to pay all the debts due from the deceased, the debt due to the United States shall be first satisfied; and the priority hereby established shall be deemed to extend, as well to cases in which a debtor, not having sufficient property to pay all his debts, shall make a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor, shall be attached by process of law, as to cases in which an act of legal bankruptcy shall be committed."

*nal Revenue Service*, 51 Md.App. 681, 692, 445 A.2d 1057, 1064 (1982).

 The federal insolvency statute "on its face permits of no exceptions whatsoever" and it "applies to all the insolvent's debts to the Government, whether or not arising from taxes, and whether or not secured by a lien." *United States v. Vermont*, 377 U.S. 351, 357, 84 S.Ct. 1267, 1270–1271, 12 L.Ed.2d 370 (1964). The statute creates a priority, not a lien, in favor of the United States. *United States v. Oklahoma*, 261 U.S. 253, 259, 43 S.Ct. 295, 297, 67 L.Ed. 638 (1923); *Beaston v. Farmers' Bank of Delaware*, 12 Pet. 102, 133, 9 L.Ed 1017 (1838), *Weiprecht v. Ripple, supra*, 217 Md. at 347, 143 A.2d at 68. The United States is entitled to assert this priority in any jurisdiction where the property of an insolvent is being administered. *United States v. Knott*, 298 U.S. 544, 552, 56 S.Ct 902, 906, 80 L.Ed. 1321 (1936).

 The priority does not attach until the insolvent debtor has been divested of his property in one of the modes specified in the statute, at which time the person vested with title becomes trustee for the United States and is required to pay its claim first. *Weiprecht v. Ripple, supra*, 217 Md. at 347–348, 143 A.2d at 68. The appointment of a receiver to take over and liquidate Coleman's business, while Coleman was insolvent, constituted an "act of bankruptcy" under § 3713(a)(1)(A)(iii) and brought this case within the statute. 217 Md. at 348, 143 A.2d at 68.

"There is no exception [to § 3713] for situations in which the United States is competing as a creditor with victims of a taxpayer's embezzlement." *Mickelson v. Barnet, supra*, 390 Mass. at 793, 460 N.E.2d at 570. In this case, the Commissioner has emphasized that the payment of funds held by the receiver to the IRS would have an unjust impact on the defrauded investors. When the Supreme Court held that embezzled funds constituted taxable income, however, the majority was not swayed by similar arguments from other justices. *See James v. United States, supra*, 366

U.S. at 229, 81 S.Ct. at 1060 (Black, J., concurring in part and dissenting in part) ("All of us know that with the strong lien provisions of the federal income tax law an owner of stolen funds would have a very rocky road to travel before he got back, without paying a good slice to the Federal Government, such funds as an embezzler who had not paid the tax might, perchance, not have dissipated"); 366 U.S. at 252, 81 S.Ct at 1072 (Whittaker, J., concurring in part and dissenting in part) (the rule "would allow the Commissioner of Internal Revenue to assert and enforce a prior federal tax lien against" the victim's property).

■ The priority established by § 3713 is a matter of federal law. The statute cannot be impaired or superseded by a state law. *United States v. Oklahoma, supra,* 261 U.S. at 260, 43 S.Ct. at 298; *Field v. United States,* 9 Pet. 182, 201, 9 L.Ed 94 (1835); *Mickelson v. Barnet, supra,* 390 Mass. at 795, 460 N.E.2d at 571.

■ The United States' right of priority under the federal insolvency statute extends to all of a debtor's property until his debt is paid. *Hunter v. United States,* 5 Pet. 173, 184, 8 L.Ed 86 (1831). Nonetheless, what constitutes an insolvent debtor's "property" at the time when the statute becomes applicable is ordinarily determined by state rather than federal law. *Ideco Division of Dresser Indus. v. Chance Drilling Co.,* 422 F.2d 165, 168–169 (5th Cir. 1970). *See Aquilino v. United States,* 363 U.S. 509, 512–513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960) (determination of whether a taxpayer has an interest in property to which a federal tax lien can attach is a question of state law); *First Nat. Bank of Cartersville v. Hill,* 412 F.Supp. 422, 425 (N.D.Ga.1976) (federal tax lien cannot attach to property which debtor holds as a constructive trustee under state law); *Dennis v. United States,* 372 F.Supp. 563, 568 n. 1 (E.D.Va.1974). In this case, the federal government concedes that the claim of the IRS can only be satisfied out of

Coleman's property as defined by Maryland law.[6]

## III.

The receiver of the assets of an insolvent is vested with full title to all property and assets of the insolvent. Code (1975, 1983 Repl.Vol., 1989 Cum.Supp.), § 15–101(c) of the Commercial Law Article. The Commissioner asserts, however, that the funds held by the receiver in this case are the property of the defrauded investors, for the assets that were sold to generate those funds never belonged to Coleman. Under the Commissioner's theory, Coleman only held the assets as a constructive trustee for the benefit of the investors.

In *Wimmer v. Wimmer*, 287 Md. 663, 668, 414 A.2d 1254, 1258 (1980), we defined a constructive trust as follows:

"A constructive trust is the remedy employed by a court of equity to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of said proper-

---

**6.** While the scope of Coleman's interest in property is ordinarily determined by reference to state law, it is doubtful that Congress intended to allow the United States' priority under § 3713 to be defeated by the imposition of a constructive trust regardless of the circumstances concerning commingling and dissipation of the property.

Courts of Appeal in two federal circuits have indicated that there is a federal law of tracing in the context of determining what property becomes part of a bankruptcy estate under federal bankruptcy laws. *See Matter of Kennedy & Cohen, Inc.*, 612 F.2d 963, 966 (5th Cir.), *cert. denied sub. nom. Wisconsin v. Reese*, 449 U.S. 833, 101 S.Ct 103, 66 L.Ed.2d 38 (1980) (While "constructive trusts recognized by state law may be imposed against specified assets in appropriate circumstances, and those assets do not become part of the bankrupt's estate," the "question of whether a constructive trust, which cannot be traced to specific assets, will attach to general funds held by the Trustee in Bankruptcy is a matter of federal law"); *Matter of Esgro, Inc.*, 645 F.2d 794, 798 (9th Cir.1981) (Even if California law imposes a trust on commingled funds, that trust could not be enforced in a federal bankruptcy proceeding).

Our resolution of this appeal makes it unnecessary to consider this matter. Moreover, as previously indicated, the United States has taken the position in this Court that, in the present case, the issue is solely a matter of Maryland law.

ty. The remedy is applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper method, or where the circumstances render it inequitable for the party holding the title to retain it. ... The purpose of the remedy is to prevent the unjust enrichment of the holder of the property."

A constructive trust is based not on a "preference" over other creditors but on a property right. *County Commissioners of Frederick County v. Page,* 163 Md. 619, 637, 164 A. 182, 190 (1933); *Drovers' Bank v. Roller,* 85 Md. 495, 498, 37 A. 30, 31 (1897). Thus, if a constructive trust is imposed on the funds held by the receiver, those funds will be considered the property of the defrauded investors. *Levin v. Security Financial,* 246 Md. 712, 718, 230 A.2d 93, 96 (1967). They will not be available to the receiver to satisfy the claims of creditors, including the tax claim of the IRS.

The Commissioner, of course, recognizes that the assets sold by the receiver were not the actual properties taken by Coleman from the investors. The Commissioner attempts to overcome this problem by tracing the monies defrauded from the investors to those assets. The Commissioner concedes that Maryland law generally requires a *cestui que trust* to establish by clear evidence that his funds can be traced to the account or property over which he seeks to impose a constructive trust. The Commissioner argues, however, that in this case it was only necessary to trace the investors' monies into Coleman's general assets. According to the Commissioner, the burden then shifted to the IRS to identify which assets sold by the receiver were purchased with money legitimately obtained by Coleman. This argument is clearly without merit. The Commissioner bore the burden of tracing funds from the defrauded investors to the assets collected and sold by the receiver. *Drovers' Bank v. Roller, supra,* 85 Md. at 501, 37 A. at 32 ("a claimant has no right to take from creditors that which he

cannot show to be equitably his own").[7]

The early English rule on tracing money was that "when the subject of the trust was money or had been converted into money and then mixed and confounded in a general mass of the same description, so as to be no longer divisible or distinguishable," there was no right on behalf of an owner to follow and reclaim his property. *Drovers' Bank v. Roller, supra,* 85 Md. at 498–499, 37 A. at 31. Nevertheless, in *Drovers' Bank,* and in *Englar v. Offutt,* 70 Md. 78, 16 A. 497 (1889), this Court recognized that, under the more modern cases, if a person mixes trust funds "with his own money, and afterwards draws out sums ... the drawer must be taken to have drawn out his own money rather than that belonging to the trust." *Englar v. Offutt, supra,* 70 Md. at 86–87, 16 A. at 499 (citing *In re Hallett's Estate,* and *Knatchbull v. Hallett,* 13 Ch. Div. 696, 753 (1879)).

In *Englar,* a guardian of two infants misappropriated $10,238.20 of the infants' money by mixing it in a bank account through which he conducted a business. The guardian made withdrawals for loans, payment of "outstanding paper," and payment for bills of merchandise, leaving a balance of $48.49 remaining in the particular

---

7. The rationale for the Commissioner's burden of proof contention is as follows. The Commissioner asserts that the IRS is claiming through Coleman, and the Commissioner invokes the rule that a trustee who mingles trust property with his own must distinguish it or lose it. *Bass v. Smith,* 189 Md. 461, 471, 56 A.2d 800, 805 (1948); *Englar v. Offutt,* 70 Md. 78, 87, 16 A. 497, 499 (1889); *Kreuzer v. Cooney,* 45 Md. 582, 591 (1877). The circuit court found that Coleman mingled investor money with his own assets. We do not accept the Commissioner's argument that the IRS is "claiming through Coleman" for purposes of this rule. The defrauded investors, with their court-approved claims, and the IRS, with its tax claim, are equally innocent parties competing for the proceeds of a liquidation sale. The rule invoked by the Commissioner is "useful to work out equity between a wrongdoer and an innocent victim." *Cunningham v. Brown,* 265 U.S. 1, 13, 44 S.Ct 424, 427, 68 L.Ed. 873 (1924). It has no application in this case.

The Commissioner's reliance on the presumptions associated with confidential relationships, articulated in *Wimmer v. Wimmer,* 287 Md. 663, 668–669, 414 A.2d 1254, 1258 (1980), and *Bass v. Smith, supra,* 189 Md. at 469, 56 A.2d at 804, is equally misplaced.

account. More than three years later, he and his partner executed a general assignment to a trustee for the benefit of creditors. The trustee sold all of the partnership property and assets. A sum of $6,543.60 remained in the trustee's hands. The infants, by their next friend, filed a petition charging that they, and not the business creditors, were entitled to the money.

Chief Judge Alvey, for the Court in *Englar*, explained that "[s]o long as a trust fund can be traced," a court will "attribute the ownership thereof to the *cestui que trust*, and will not allow the right to be defeated, by the wrongful act of the trustee or fiduciary in mixing or confusing the trust fund with funds of his own, or even those of a third party." 70 Md. at 85–86, 16 A. at 499. "The true owner of a fund traced to the possession of another has a right to have it restored, not as a debt due and owing, but because it is his property wrongfully withheld from him." 70 Md. at 86, 16 A. at 499. Chief Judge Alvey concluded that "[t]he sole question therefore, in every case where trust property is attempted to be traced, is whether it can or cannot be identified, either in its original or altered form." 70 Md. at 87–88, 16 A. at 499. While there was no difficulty tracing the infants' money into the business bank account, the balance in that account had been reduced to $48.49. The infants contended that their money had been drawn out of the bank and invested in the business, and that they had a right to pursue the stock of goods found in their guardian's store and fix a charge upon the proceeds of the sale of those goods. The Court noted, however, that it was "impossible to say ... what portion of the stock of goods that passed into the hands of the assignee, under the general assignment for the benefit of creditors, was the product of the trust fund belonging to the appellants." 70 Md. at 89, 16 A. at 500. The fund in court for distribution could not be identified as the product of any investment of the original trust fund belonging to the infants. Thus, the Court affirmed the dismissal of their petition. 70 Md. at 91, 16 A. at 501.

The infants in *Englar* lost the benefit of the presumption that withdrawals from the commingled business account were from their guardian's money, leaving their money intact, once the account became virtually depleted. The infants had no special claim to money that was later deposited into the same account. 70 Md. at 88, 16 A. at 499–500.

In *Drovers' Bank v. Roller, supra,* 85 Md. 495, 37 A. 30, D. & W. Roller consigned to a partnership, for sale, a quantity of live hogs. The partnership sold the hogs in several lots and received funds from most of those sales. Those funds, without ear-mark or identification, were deposited in the partnership account at the Drovers' and Mechanics' National Bank, where they were intermingled with other partnership funds, and paid out in checks given for other demands. The account became overdrawn. The partnership, which had become insolvent, executed a deed of trust for the benefit of its creditors. The assets collected by the trustees did not represent the proceeds of the sale of Roller's consigned hogs, or the proceeds of the sale of property in which the proceeds of the sale of the hogs had been invested. A portion of the hogs had not yet been paid for by the purchasers when the deed of trust was made, and afterwards the trustees collected, and had in their hands, these particular proceeds of sales. Roller filed a claim in the trust estate, attempting to establish a priority to the extent of the whole net proceeds from the sale of Roller's hogs. This Court held that Roller was entitled to the money in the trustees' hands which was paid to them after the deed of trust by the purchasers of some hogs. Roller had no priority, however, with respect to the proceeds from the sale of partnership assets generally. The Court specifically declined Roller's request to adopt a doctrine that where

"the funds cannot be traced or identified, a lien still exists upon all the debtor's general assets in the hands of his trustee, in favor of the owner or *cestui que trust* whose property or money has been mingled with that of the fiduciary, and has been used by him in liquidating other

claims against himself; and that this lien is a preferential one over other creditors of the debtor." 85 Md. at 499, 37 A. at 31.[8]

This Court has summarized the standards regarding what will be accepted as sufficient identification when a party attempts to trace money into property held by a trustee (*Frederick County v. Page, supra,* 163 Md. at 638–639, 164 A. at 190–191):

"It is not essential to a sufficient identification that the fund or property delivered to the trustee be traced in the precise or identical form in which it was received, but it is sufficient if it can be traced into some product or substitute for the original fund. ... [W]here trust funds, which have been mingled with other funds by the trustee, remain in the insolvent estate and go to swell it, the identification is sufficient. And so it has been held that a fund taken over by the receiver of an insolvent trustee as a part of the insolvent estate will be assumed to include the trust fund, on the theory that depletions of the general estate were from the proper funds of the trustee and not from the trust fund. But where it appears that the trust fund has been dissipated or so mingled and merged with the general assets of the insolvent estate as not to be separable or distinguishable therefrom, there is

---

8. Today, the Commissioner urges this Court to adopt a rule that would have the same effect: where the general estate of a trustee passes to a receiver, the general fund should be treated as a specific fund for purposes of tracing funds. The Commissioner cites five cases, none of which, in our opinion, articulates such a broad proposition. *See Miller & Co. v. Gibbs,* 161 Ga. 698, 132 S.E. 626 (1926); *Reichert v. United Sav. Bank,* 255 Mich. 685, 239 N.W. 393 (1931); *Blythe v. Kujawa,* 175 Minn. 88, 220 N.W. 168 (1928); *State v. Farmers' State Bank of Polk,* 121 Neb. 532, 237 N.W. 857 (1931); *Raynor v. Scandinavian-American Bank,* 122 Wash. 150, 210 P. 499 (1922).

We decline to adopt this rule, which would amount to a masked preference for victims of fraud in derogation of federal and state law mandating the order of distribution of an insolvent's estate. A victim of fraud would always be able to satisfy his claim first, for the defrauder's assets would be the victim's property, even if those assets had been acquired years before the fraud. The victim could simply reclaim "his" property before any distributions to creditors.

no identification, and the *cestui que trust* has no claim other than as a general creditor.... And, where the funds of the insolvent trustee taken over by the receiver at the time of his appointment include more than one trust fund, all such funds must share ratably."

It is noteworthy that in *Cunningham v. Brown,* 265 U.S. 1, 11, 44 S.Ct. 424, 426, 68 L.Ed. 873 (1924), the United States Supreme Court held that a person who wishes to establish a constructive trust on money must trace the money from the hands of the defrauded person to the fund over which he seeks to impose the trust. In *Cunningham,* the trustee in bankruptcy of Charles Ponzi (the namesake of the term "Ponzi scheme") was able to recover, as unlawful preferences, monies returned from Ponzi to certain investors in his fraudulent pyramid scheme. Those investors lost because they could not trace their investments in and out of Ponzi's bank account.

Turning to the present case, the Commissioner's attempt to trace funds from the defrauded investors to the assets sold by the receiver is based on an audit of Coleman's activities. An accountant, employed as an investigative auditor with the office of the Maryland Attorney General, conducted an analysis of Coleman's financial ativities between 1982 and 1986. The auditor determined that Coleman had deposited monies defrauded from the 118 investor claimants into three bank accounts. One account was in the name of Coleman and Associates. The other two accounts were in the name of Data Video. Of all the monies deposited in these three accounts, $1,985,851.40 was investor money and $139,368.51 came from other sources. The auditor provided no dates for the deposits.

The auditor further determined that these three accounts were not limited in use for any specific business purpose, but rather were used by Coleman as a source of funds for personal expenses and to pay expenses incident to business ventures other than those suggested by the account names. The auditor concluded that withdrawals from these three

accounts included, *inter alia*, $392,814.16 to pay for Computer Concepts inventory and fixtures. The auditor did not, however, indicate what percentage of the inventory and fixtures sold by the receiver was purchased with this money. Nor did the auditor provide dates for the withdrawals.

The auditor referred to three other bank accounts through which Coleman conducted business. These other three accounts were in the names of Data Video, David Coleman T/A Metro Computer Services, and Club Inferno. The auditor, concluding that none of the monies defrauded from the 118 approved investor claimants were deposited in these accounts, presented no information regarding them. It is possible that legitimate income from the operations of Computer Concepts was deposited into these accounts. It is also possible that a significant percentage of the inventory and fixtures sold by the receiver was purchased with money withdrawn from these accounts. The record is silent concerning Coleman's overall income from Computer Concepts and his overall expenses for inventory and fixtures. The auditor also failed to indicate the source of funds for Coleman's automobile, which was sold by the receiver.

Indeed, the absence of dates in the auditor's report makes it impossible to discount the possibility that Coleman opened his stores and purchased a large percentage of the liquidated inventory and fixtures prior to receiving any funds from the defrauded investors.

If any funds had remained in the three accounts into which Coleman deposited investor money, the investors might have benefited from the presumption that withdrawals from a commingled fund are presumed to be from legitimately obtained funds, so that illegitimately obtained funds remain. According to the record, however, no funds remained in those accounts when the receiver seized Coleman's assets. As *Englar v. Offutt, supra,* and *Drovers' Bank v. Roller, supra,* demonstrate, any presumption ends when the account is depleted.

In evaluating the Commissioner's tracing in this case, the circuit court summarized:

"A review of the many claims filed in this case evidences claims for rent, by video club members, by trade creditors, for furniture, etc. A review of the claims shows that as much as $200,000 may be properly chargeable against the trust fund other than claims by the investor/claimants. While the amount of these 'other' claims is small compared with the total investor claims, it cannot be ignored. It is evident that Coleman operated retail outlets for home video equipment, home movies, personal computers, and other related equipment. A substantial amount of the money obtained from investor/claimants was used to purchase the inventory and equipment sold by the receiver. How much income received from retail sales and how much of the equipment sold was furnished by trade creditors is not known. The predominance of investor money in the picture does not mean the exclusiveness of investor money traceable to an identifiable fund.

"When all is said and done, it cannot be that the Securities Commissioner is able to recapture property of the investors. No case prohibits the creation of a constructive trust when there has been a change of form with the monies or property. Some cases indicate that the form may be altered and a tracing may occur into some product or substitute for the original fund. But when as here, the funds of the investors and others have been so mingled and merged with the general assets of the insolvent estate as not to be separable or distinguished therefrom, there is no identification. To do so here would be to choose fiction over fact and to give a forced and unnatural meaning to the concept of tracing. That should not be done. The individual investor/claimants are general creditors only."

We find no error in the circuit court's application of the tracing rules set forth in this Court's cases. Indeed, the circumstance of today's case are quite similar to *Englar v.*

*Offutt, supra,* 70 Md. 78, 16 A. 497, where this Court held the tracing to be inadequate. It is clear that the Commissioner did not sufficiently trace the monies defrauded from the investors to the assets sold by the receiver. The proceeds from the liquidation sale cannot be deemed the property of the investors.[9] If we were to hold for the Commissioner, we would be creating a preference for the investors that runs counter to federal and state law governing the order of distribution of an insolvent's estate. The IRS claim is entitled to priority under 31 U.S.C. § 3713.

JUDGMENT AFFIRMED, WITH COSTS.

---

**9.** The Commissioner relies on two federal cases, *In re Teltronics, Ltd.,* 649 F.2d 1236, 1243 (7th Cir.1981), and *Matter of Johnson,* 80 B.R. 791, 799 (E.D.Va.1987). In each case, the court approved a constructive trust over funds that were identified as collectively traceable to fraudulent activity, even though the victims of fraud had not individually traced their monies. In the present case, the funds resulting from the sale of Computer Concepts inventory and fixtures and an automobile, have *not* been demonstrated to be collectively traceable to Coleman's fraudulent activity. Thus we have no occasion to consider the rationale of *Teltronics* and *Johnson.*