*Daniel Rohrer v. Humane Society of Washington County*
No. 32, September Term 2016

**Animals – Abuse or Neglect of Animals – Seizure of Animal from Owner.** Under Maryland Code, Criminal Law Article, §10-615, an officer of a humane society may take possession of an animal from its owner "if necessary to protect the animal from cruelty" or "if necessary for the health of the animal." When an animal has already been removed from its owner pursuant to a criminal search and seizure warrant based on alleged animal cruelty, a humane society officer may not exercise its authority under §10-615 to seize the animal from State custody. However, the humane society may notify the owner of its intent to exercise its authority to take possession of the animal upon its release from State custody under the warrant. Maryland Code, Criminal Law Article, §10-615.

**Animals – Abuse or Neglect of Animals – Timeliness of Evidence Justifying Seizure of Animal from Owner.** The decision of a humane society officer to take possession of a mistreated animal under Maryland Code, Criminal Law Article, §10-615, may not be based upon "stale" information. The temporal relationship between the alleged circumstances of abuse or neglect and the time that a humane society officer takes possession of the animal is relevant to a determination whether the officer's action was "necessary to protect the animal from cruelty" or "necessary for the health of the animal." In a case where an animal is seized pursuant to a criminal search and seizure warrant based on a finding of probable cause of contemporaneous violations of the animal cruelty laws, a humane society officer may take possession of the animal upon the animal's release from seizure under the warrant, on the basis of the same allegations that supported the warrant. Whether the humane society may continue to possess the animal is subject to determination in an administrative proceeding or a judicial proceeding concerning a petition for return of the animal. Maryland Code, Criminal Law Article, §10-615.

**Animals – Abuse or Neglect of Animals – Seizure of Animal – Petition for Return of Animal.** An owner of an animal that has been seized by a humane society officer pursuant to the authority of Maryland Code, Criminal Law Article, §10-615, may – if no administrative remedy is available – file a petition for return of the animal as provided in that statute. Denial of a petition for return of the animal resolves temporarily whether the owner has a right to possess the animal, but does not divest the owner of the ownership interest in the animal. The right to possess the animal reverts back to the owner when possession by the humane society is no longer "necessary to protect the animal from cruelty" or "necessary for the health of the animal." Maryland Code, Criminal Law Article, §10-615.

Circuit Court for Washington County
Case No. 21-C-15-054127
Argument: January 6, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 32

September Term, 2016

_____

DANIEL ROHRER

V.

HUMANE SOCIETY OF WASHINGTON COUNTY

_____

Barbera, C.J.,
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by McDonald, J.

_____

Filed: June 27, 2017

This case concerns the application of a State statute designed to remedy mistreatment of animals. In particular, we must construe Maryland Code, Criminal Law Article ("CR"), §10-615 which, among other things, authorizes an officer of a humane society to take possession of an animal from its owner "if necessary to protect the animal from cruelty" or "if necessary for the health of the animal." Pondering laws that regulate the treatment of animals by people can provoke profound questions concerning the nature of human beings and their relationship to the natural world.[1] A statute that deputizes an officer of a private entity to seize an animal belonging to another without prior judicial process and that provides only cryptic direction concerning the consequences of that seizure raises serious constitutional questions under the Fourth Amendment, the Due Process Clause, and their analogs in the Maryland Constitution.[2]

We will not resolve those questions. Our task is more mundane. We must determine whether the circumstances under which a humane society exercised its authority under CR §10-615 to take possession of a farmer's animals based on allegations of animal cruelty were consistent with that statute in two respects. We must also decide how that action may

---

[1] *See, e.g.,* S.M. Wise, *The Legal Thinghood of Nonhuman Animals*, 23 B.C. Envtl. Aff. L. Rev. 471 (1996); C. Gutleben, *Compassion for Animals: A Religious Tradition*, 43:2 Md. Bar. J. 36 (2010).

[2] *See, e.g., Porter v. DiBlasio*, 93 F.3d 301, 305-10 (7th Cir. 1996); *Pine v. Texas*, 921 S.W.2d 866, 873-74 (Tex. App. 1996); B. J. Bearup, *Pets: Property and the Paradigm of Protection*, 3 J. Animal L. 173, 179-83, 187-89 (2007); H.D. Winters, *Updating Ohio's Animal Cruelty Statute: How Human Interests Are Advanced*, 29 Cap. U. L. Rev. 857, 865, 875-76 (2001).

have affected the farmer's ownership interest in the animals. The resolution of those issues in this case turns in part on the existence of a parallel criminal prosecution and the execution of a criminal search and seizure warrant involving the same animals.

In late 2014, officers of the Respondent Humane Society of Washington County ("Humane Society"), together with other law enforcement officers, executed a criminal search and seizure warrant at the farm of Petitioner Daniel Rohrer. The search and seizure warrant, which was based on an affidavit of a Humane Society officer alleging abuse and neglect of animals at the farm, resulted in the seizure and removal of nearly 100 animals from Mr. Rohrer's farm. Acting as an agent of the State, the Humane Society placed the animals with foster farms while the animals remained in State custody.

In early 2015, the Humane Society decided that, regardless of the outcome of the criminal animal cruelty charges pending against Mr. Rohrer, the seized animals should not be returned to him. Invoking its authority under CR §10-615, the Humane Society notified Mr. Rohrer of its intent to "seize/remove" those animals. Pursuant to the same statute, Mr. Rohrer petitioned the District Court for their return. The District Court denied Mr. Rohrer's petition in light of the pending criminal charges.

Ultimately the vast majority of the animal cruelty charges against Mr. Rohrer were disposed of by dismissal or acquittal. The District Court found him guilty of five misdemeanor counts related to three animals, sentenced him to probation before judgment, released all of the animals from seizure under the warrant, and required him to implement a farm management plan under the supervision of the Humane Society. Although the

2

disposition of the criminal charges released the animals from the warrant, the Humane Society retained possession of the animals, relying on the District Court's earlier denial of Mr. Rohrer's petition for their return under CR §10-615.

Mr. Rohrer appealed the District Court decision denying his petition for return of the animals to the Circuit Court for Washington County. He argued that possession of the animals by the Humane Society did not satisfy the standards set forth in CR §10-615 and that, in any event, the Humane Society had failed to follow that statute's procedures. The Circuit Court rejected those challenges and affirmed the District Court decision.

In this Court, Mr. Rohrer again raises questions about the authority of the Humane Society to act under CR §10-615, as well as the legal status of animals seized under that law.

We hold that, while the statute does not provide for seizure of an animal that is already in State custody in connection with a criminal proceeding, an officer of a humane society may notify the animal's owner or custodian of an intent to take possession of the animal upon the animal's release from State custody in the criminal case. In addition, seizure of an animal under the statute need not occur contemporaneously with the alleged mistreatment of the animal. However, the temporal remoteness of the alleged mistreatment is relevant to whether it is "necessary to protect the animal from cruelty" or "necessary for the health of the animal" for the humane society to take – and retain – possession of the animal. The statute gives a humane society the authority to temporarily possess an animal

3

when those standards are satisfied, although that authority expires when the necessity ends. The statute does not purport to determine ownership of the animal.

# I

## Background

### A.    *Animal Cruelty Law and Procedure*

*Maryland Animal Cruelty Laws*

Under the common law, farm animals, such as horses, cattle, sheep, and pigs, were treated as a form of personal property. *See City of Hagerstown v. Witmer*, 86 Md. 293, 300-01 (1897); 3B C.J.S. *Animals* §3. Mistreatment of animals had legal significance only to the extent that it interfered with someone's property interest in the animal. *See* S. M. Wise, *The Legal Thinghood of Nonhuman Animals*, 23 B.C. Envtl. Aff. L. Rev. 471, 525-28 & n.372 (1996); *see also* Maryland Code, Article 27, §§80-81 (1914); *cf. Hurd v State*, 190 Md. App. 479 (2010) (affirming conviction for malicious destruction of property based on shooting of pet dog).

During the mid-nineteenth century, legislatures began to enact animal protection laws that were not based primarily on the protection of a property interest. C.E. Friend, *Animal Cruelty Laws: The Case for Reform*, 8 U. Rich. L. Rev. 201 (1974). In Maryland, local governments took the lead in passing ordinances that barred abuse of animals. In 1890, the General Assembly enacted a statewide law prohibiting "torture or cruelty" with

4

respect to animals, and classified a violation of that law as a misdemeanor.[3]  Chapter 198,

Laws of Maryland 1890, *then codified at* Article 27, §§63-64; *see State v. Falkenham*, 73

Md. 463, 466 (1891) (holding that new statewide law superseded a local law on animal

cruelty).  That law defined "torture or cruelty" to "include everything whereby unjustifiable

physical pain, suffering or death is caused."  It defined "animal" to include "every living

creature except men."

The State animal cruelty law has been amended and refined over the years.  It is

currently codified in Maryland Code, Criminal Law Article ("CR"), §10-601 *et seq.*  A key

provision of this subtitle is CR §10-604, which prohibits abuse or neglect of an animal.

Among other things, that statute defines criminal sanctions both for the intentional

infliction of "unnecessary suffering or pain on an animal" as well as for the failure to

provide the animal with sufficient food, water, space, and shelter.[4]  *See Silver v. State*, 420

---

[3] Every other state and the District of Columbia have adopted similar laws regulating the treatment of animals.  *See* Madeline Bernstein and Barry M. Wolf, *Time to Feed the Evidence: What to Do With Seized Animals*, 35 Envtl. L. Rep. 10679 (2005).

[4] That statute provides, in pertinent part:

(a)  A person may not:

1)  overdrive or overload an animal;

2)  deprive an animal of necessary sustenance;

3)  inflict unnecessary suffering or pain on an animal;

4)  cause, procure, or authorize an act prohibited under item (1), (2), or (3) of this subsection; or

5

Md. 415 (2011) (upholding a conviction for animal cruelty under CR §10-604).  An individual who is convicted of a charge of animal cruelty may be prohibited from "owning, possessing, or residing with an animal."  CR §§10-604(b)(3), 10-606(b)(3).

*Role of Humane Societies in Enforcement of Animal Cruelty Law*

Since 1900, Maryland law has authorized members of humane societies to serve as animal control units and to help carry out the State's laws concerning the protection of animals from abuse or neglect.  Chapter 456, Laws of Maryland 1900, *then codified at* Article 27, §46T (authorizing "any officer or agent of the Maryland Society for the Prevention of Cruelty to Animals or of any [similar] society" to take charge of abandoned, diseased, or disabled animals).  The animal cruelty law currently defines "humane society" as "a society or association incorporated in Maryland for the prevention of cruelty to animals."  CR §10-601(d).  Although a humane society is a private entity,[5] the criminal

---

> 5) if the person has charge or custody of an animal, as owner or otherwise, unnecessarily fail to provide the animal with nutritious food in sufficient quantity, necessary veterinary care, proper drink, air, space, shelter, or protection from the weather.

CR §10-604(a); *see also* CR §§10-606, 10-607, and 10-608 (prohibiting various types of "aggravated" animal cruelty).

[5] The first organization dedicated to animal welfare – *i.e.,* the first humane society – was founded in England in 1824.  SPCA International, Our History, http://www.spcai.org/about-spcai/our-history/ [https://perma.cc/Y7EV-4XRR].  The first such organization in the United States was the American Society for the Prevention of Cruelty to Animals, or ASPCA, which was founded in 1866.  ASPCA, About Us, https://www.aspca.org/about-us [https://perma.cc/HBA6-AMG3]; *see also* American Humane, History, https://www.americanhumane.org/about-us/history/ [https://perma.cc/7XCQ-HTHD] (stating that American Humane was founded in 1877 as a "unified voice"

statutes concerning animal cruelty delegate to humane societies certain powers to carry out the State's policy against animal cruelty.[6]  For example, a humane society officer may arrest anyone "committing a misdemeanor that involves cruelty to an animal."  CR §10-609.  Pertinent to this case, an officer of a humane society may also seize or remove an animal from its owner under CR §10-615.  This case concerns how the power conferred on a humane society by CR §10-615 to take possession of an animal is to be exercised and the consequences of the exercise of that power.[7]

---

for 27 humane societies in 10 different states).  Today, most humane societies operate as independent, local organizations.  ASPCA, Pet Statistics, https://www.aspca.org/animal-homelessness/shelter-intake-and-surrender/pet-statistics [https://perma.cc/Q9E4-9WS5].

[6] The delegation of enforcement authority of animal cruelty statutes to a humane society was first adopted in New York in the late 19th century; other states, including Maryland, enacted similar legislation.  *See* E. R. Rumley & R. W. Rumley, *Enforcing Animal Welfare Statutes:  In Many States, It's Still the Wild West*, 21 San Joaquin Agric. L. Rev. 21, 24-25 (2012).

[7] Other laws may authorize the seizure or detention of certain types of animals when they are perceived as a threat to human health or safety or to the health of domestic animals.  *See* Maryland Code, Health-General Article, §18-217 *et seq.* (authorizing Secretary of Health and Mental Hygiene to prohibit, among other things, the possession of animals found to be dangerous to human health and safety and authorizing their seizure by law enforcement officers); Maryland Code, Agriculture Article ("AG"), §3-101 *et seq.* (delineating powers of Secretary of Agriculture to protect health of domestic animals from contagious or infectious diseases).

7

## B. Facts and Judicial Proceedings

### The Farm

Mr. Rohrer owns and runs a farm in Boonsboro, Maryland. A self-described "Old MacDonald," he raises various livestock – including cattle, sheep, goats, and chickens – for slaughter and egg production. He sells meat at farmer's markets and participates in "farm-to-fork" programs. At any given time, there may be several hundred animals on his farm. Raising animals for food production is his livelihood.

### The Investigation

During the fall of 2014, the Humane Society received an anonymous call from an individual concerned about whether animals on Mr. Rohrer's farm were adequately fed. In response, on November 19, 2014, Crystal Mowery, a field services officer with the Humane Society, conducted a drive-by inspection of the farm. After seeing several cattle that "appeared to be thin," Officer Mowery returned to her office and contacted Dr. Edward Wurmb, a veterinarian. They and another Humane Society officer went to Mr. Rohrer's farm later that day for a closer inspection. Dr. Wurmb observed a number of cattle in the pasture that were "extremely thin" and "walking skeletons," with some in "imminent danger of dying if it got cold."[8] Officer Mowery asked Mr. Rohrer if they could examine

---

[8] During this visit to the farm, Dr. Wurmb utilized the Virginia Cooperative Extension's "Body Condition Scoring" system to gauge the size of the cattle. *Available at* https://pubs.ext.vt.edu/400/400-795/400-795_pdf.pdf [https://perma.cc/X4J5-GYT2]. Under this system, cows are assigned a number from one to nine based on the amount of fat and muscle on the animal. A score of one indicates the cow is "extremely thin," and a

animals inside his barn.  He allowed them to look into the barn from outside, but refused to let them enter the barn without a warrant.

*The Warrant*

Two days later, on November 21, 2014, with the approval of the State's Attorney, Officer Mowery applied to the District Court of Maryland for a search and seizure warrant for Mr. Rohrer's farm.  In the application, she described the appearance of the cattle and the apparent lack of food for animals in the field.  She alleged that these conditions established probable cause to believe that Mr. Rohrer was violating various provisions of CR §10-604.  The District Court issued the warrant.  The warrant authorized Officer Mowery and other officers to enter and search Mr. Rohrer's farm for evidence of violations of the animal cruelty law, to seize any such evidence, to take photographs, and, at the recommendation of a veterinarian on the scene, to seize "any animal found to be deprived of nutritious food and water."

*Execution of the Search and Seizure Warrant*

Three days later, on November 24, 2014, Officer Mowery – accompanied by other members of the Humane Society, members of the Washington County Sherriff's Department, an Assistant State's Attorney, and Dr. Wurmb – served the warrant and conducted a search of the farm.  At that time, according to the later testimony of Officer

---

score of nine indicates the cow is "very obese."  Dr. Wurmb testified that "at least 10" cows were "twos or less," but noted that "it's hard to give a one."

9

Mowery and Dr. Wurmb, the pasture was bare with no edible forage, contained numerous empty feeders that – because of the presence of weeds and moldy hay – likely had not been filled for some time, and was littered with dead animal bones and rolls of barbed wire. The barn contained bodies of dead animals lying among the live animals, a dead sheep in the hay feeder, empty water troughs, and manure and feces piled four or five feet high. In a separate, detached chicken coop, live chickens roosted inside dead chicken carcasses, and eggs were intermingled among more than six inches of animal feces. In addition to some emaciated cows, they also discovered sheep and goats whose hooves had never been trimmed and were so overgrown that the animals could no longer walk correctly. When asked about the dead animals, Mr. Rohrer told Officer Mowery that "they lay where they die." He admitted that it had been three or four years since a veterinarian had visited his farm.

On the basis of these observations, the Humane Society and the Sheriff's Office formally "seized" all of the animals on Mr. Rohrer's farm under the authority granted by the warrant. The search warrant return and inventory completed by Ms. Mowery the next day listed the property taken pursuant to the warrant as "approximately" 50 cattle, 50 sheep, 4 goats, 15 pigs, and 50 chickens. However, no animals were physically removed from Mr. Rohrer's farm that day. Rather, they were left on the farm and Mr. Rohrer was informed that he was not to exercise any control over them. During the period between

November 25, 2014 and the expiration of the search warrant on December 10, 2014,[9] the Humane Society returned to the farm, removed many of the seized animals, and relocated them to foster farms. Other animals were "released from seizure" under a written agreement between Mr. Rohrer and the Humane Society.

*The Agreement*

The agreement, dated December 12, 2014, recited that 95 animals (40 cows, 4 goats, and 51 sheep) had been removed from the farm and that the Humane Society and Mr. Rohrer had not agreed on the disposition of those animals. It acknowledged that Mr. Rohrer retained ownership of those animals and that the Humane Society had temporary custody. The agreement further stipulated that the animals remaining on the farm were "released from seizure" and were "now under [Mr. Rohrer's] control." Finally, the agreement provided that Mr. Rohrer "must contain the animals on the property" and was responsible for providing "nutritious food in sufficient quantity, necessary veterinary care, proper drink, air, space, shelter, or protection from weather."

*Criminal Charges*

A few days later, on December 15, 2014, Mr. Rohrer was charged in the District Court with 318 misdemeanor counts of animal cruelty under CR §10-604. Case No. 2V00090540. According to Case Search, the online database of the Maryland Judiciary,

---

[9] A search and seizure pursuant to a search warrant must take place within 15 days of the day on which the warrant is issued. Maryland Code, Criminal Procedure Article, §1-203(a)(4).

most of the charges were brought under CR §10-604(a)(5), which prohibits the owner of an animal from "unnecessarily fail[ing] to provide the animal with nutritious food in sufficient quantity, necessary veterinary care, proper drink, air, space, shelter, or protection from weather." Some of the charges were brought under CR §10-604(a)(4), which prohibits anyone from causing or authorizing certain acts of mistreatment of an animal.[10]

*Unsuccessful Request for TRO*

In December 2014, following the execution of the search warrant and the removal of some of the animals, Mr. Rohrer filed suit in the Circuit Court for Washington County seeking injunctive relief, including a temporary restraining order ("TRO"), for return of the animals. By the time the Circuit Court conducted a hearing on his request for a TRO on December 18, 2014, the criminal charges had been filed in the District Court. In light of the pending criminal charges and the agreement between Mr. Rohrer and the Humane Society with respect to the animals remaining on the farm, the Circuit Court declined to grant injunctive relief pending resolution of the criminal charges.

*Notice of Seizure Under CR §10-615*

On January 20, 2015, approximately two months after execution of the search warrant and removal of some of the animals and one month after the filing of criminal charges, the Humane Society posted a notice on Mr. Rohrer's door stating that it had "seized/removed" the animals from his custody under CR §10-615(b), (c), and (f). The

---

[10] *See* footnote 4, above.

12

notice also referred to those animals as "impounded from your custody." The Humane Society posted a slightly revised version of the notice on February 5, 2015.[11] The notice referred to seizure, removal, and impoundment under the statute in the past tense, apparently referencing the actions taken in November and December 2014 under the search warrant. However, Officer Mowery later testified that the Humane Society had not decided to invoke its authority under the statute until shortly before the initial notice was posted in January 2015. She explained that, because the court had denied the TRO seeking return of the animals to Mr. Rohrer during the criminal proceedings, the Humane Society had focused on placing and caring for the animals before it sought to resolve their ultimate disposition.

The January 2015 notice advised that Mr. Rohrer could file a petition for return of the animals in the District Court within 10 days of their removal pursuant to CR §10-615(d) and that, if he chose not to avail himself of that remedy, the animals would be considered strays and disposed of according to Maryland law.[12] The notice also advised Mr. Rohrer

---

[11] The notice posted on January 20, 2015, had indicated that it applied to all animals "removed on November 24, 2014." After Mr. Rohrer noted, in his Petition for Return of the animals, that no animals had actually been removed from the farm on November 24, the Humane Society posted the second notice clarifying that it applied to "animals physically removed between November 25, 2014 and December 10, 2014." The District Court essentially treated the second notice as an amendment of the original notice. Neither party challenges that approach on appeal.

[12] With respect to the disposition of stray animals, the notice cited CR §10-617(c) - (d), which concerns the disposal of domestic animals of unknown ownership by a local animal control unit, and AG §3-603, which concerns the disposition of a "stray horse,

13

that he was "under criminal investigation" for cruelty to animals and provided written *Miranda* warnings concerning his right to remain silent, to be represented by counsel, and to have counsel appointed if he could not afford a lawyer.

*The Petition for Return of Animals*

On January 30, 2015, Mr. Rohrer filed a "Petition for Return of Seized Animals" ("Petition for Return") in the District Court, pursuant to CR §10-615(d)(2). He argued that the seizure notice was late, that the animals remaining on the farm were well cared for, that he was being deprived of the opportunity to sell certain animals for slaughter at the time of their maximum value, and that the Humane Society had no reasonable justification for holding his animals. In particular, he argued that the Humane Society had failed to provide notice under CR §10-615(d) at the time the animals were actually removed from his property and had not done so until two months later at a time when the animals were in the custody of the State pursuant to the search warrant.

*District Court Hearing on the Petition for Return*

A hearing on the Petition for Return was held in the District Court on February 20 and March 30, 2015. Mr. Rohrer testified and called three witnesses – a University of Maryland extension agent, a veterinarian, and a Maryland Department of Agriculture livestock inspector – to testify about the conditions of his farm around the time the animals

---

sheep, hog, cow, or other domestic animal" of unknown ownership by the finder of the stray animal.

were removed from his farm in late 2014. That testimony presented a somewhat different picture of Mr. Rohrer's farm and the conditions of his animals from that portrayed by the Humane Society. Mr. Rohrer explained that most of the animals he acquired were being prepared for slaughter. The extension agent, who had not previously known Mr. Rohrer, visited the farm shortly after the execution of the search warrant, but before most of the animals were removed. He opined that most of the animals were in excellent condition although some of the cattle were thin. The veterinarian, who had also visited the farm at the same time, provided similar testimony as to the condition of the animals.

Officer Mowery and Dr. Wurmb testified on behalf of the Humane Society at the hearing and reiterated the information they provided in the warrant and also described their observations of conditions when the warrant was executed. Another veterinarian testified that he had evaluated the cattle shortly after execution of the warrant and found 26 of the 40 cattle to be underweight, which he found "very concerning." Officer Mowery testified that, although the animals were originally seized and removed pursuant to the criminal search and seizure warrant in late 2014, the decision to invoke the Humane Society's authority under CR §10-615(c) was not made until shortly before January 20, 2015, when the notice was first posted at Mr. Rohrer's farm.

At the hearing, Mr. Rohrer reiterated his argument that the Humane Society had failed to provide the appropriate notice under CR §10-615(d) at the time the animals were physically removed from the farm. Alternatively, he argued that, to the extent that the Humane Society was not required to provide that notice at the time the animals were

15

removed because the animals had initially been seized by the State (with the Humane Society's assistance) under a criminal search and seizure warrant, that situation had not changed at the time that the Humane Society actually provided notice under CR §10-615, as the animals remained in State custody at that time and were not under his control.

Ruling from the bench at the conclusion of the second day of the hearing, the District Court denied Mr. Rohrer's Petition for Return, although the court lamented the "lack of guidance" in the statute as to how it was to decide the case. The court first observed that the animals had been removed from the farm pursuant to a valid search warrant "based on the evidence that was available at the time of the removal." The court cited the conditions on the farm in late 2014: the small size of the cattle in the field, the dead animals and manure in the barn, and the lack of sanitary water. The court did not directly address the adequacy of the timing of the subsequent notice under CR §10-615 by the Humane Society.

As to whether the animals should be returned to Mr. Rohrer, the court noted the December 2014 agreement between Mr. Rohrer and the Humane Society under which he retained many of the animals and under which the Humane Society acknowledged his ownership of the seized animals. With respect to the animals that had been removed from the farm, the court observed that they "appear to be being well taken care of" by the Humane Society and that "the best interest of the animals" would be served by remaining in that care "at this particular stage ... particularly between now and ... the hearing on [the criminal animal cruelty charges]."

16

When Mr. Rohrer's counsel raised the question whether he would lose ownership of the animals as a result of the court's ruling, the District Court stated that "the statute really doesn't say that" and pointed to the December 2014 agreement which, in the District Court's words, "says what it says" – that Mr. Rohrer retained ownership of those animals.

Mr. Rohrer promptly appealed the District Court decision to the Circuit Court for Washington County.

*Criminal Trial*

In the meantime, while the appeal of the District Court's denial of the Petition for Return of the animals was pending, the criminal charges proceeded to trial before a different judge of the District Court. A bench trial was held over the course of several days in May and July 2015. At the outset of the trial, the State dismissed 288 of the 318 counts. At the conclusion of the State's case, the court granted a motion for judgment of acquittal as to six additional counts. At the conclusion of all the evidence, the State dismissed four more counts. Of the remaining 20 counts, the District Court found Mr. Rohrer not guilty on 15 counts. The District Court found Mr. Rohrer guilty on five counts relating to three animals but, as provided in Maryland Code, Criminal Procedure Article, §6-220, withheld the entry of judgment and placed him on unsupervised probation before judgment for three years with respect to those counts.[13]

---

[13] Although we do not have the full record of the criminal case before us, one of the pleadings from a related case contained in the Record Extract indicates that the five counts on which Mr. Rohrer was found guilty related to failing to provide adequate space for two

17

In a probation order issued on July 22, 2015, the court added a special condition of probation that required Mr. Rohrer to comply with a farm management plan supervised by the Humane Society. The probation order stated that the animals were "released from seizure" – presumably referring to seizure under the criminal search warrant – and that "any action to recover may be brought in a civil proceeding." Mr. Rohrer apparently did not appeal this disposition of the criminal charges.

*Failed Negotiations for Return of Animals*

After the adjudication of the criminal charges, but while Mr. Rohrer's appeal of the District Court's denial of the Petition for Return was still pending in the Circuit Court, the parties attempted to negotiate the disposition of Mr. Rohrer's animals. In an email dated August 28, 2015, counsel for the Humane Society indicated his belief that the District Court's decision on the Petition for Return was dispositive as to the ownership of the animals – *i.e.,* the denial of the petition eliminated Mr. Rohrer's ownership interest of the animals. Nevertheless, counsel for the Humane Society offered to return some – but not all – of the animals, provided that Mr. Rohrer agreed to abide by the terms of his probation. Counsel indicated that the offer was "not negotiable," and if not accepted within three days, all of the remaining animals would be given away.

---

goats and one sheep and failing to trim the hooves of one goat and one sheep. All of the charges related to cattle were either dismissed or resulted in an acquittal.

18

In response to this email, on August 31, 2015, Mr. Rohrer filed a Motion for Ex Parte Emergency Relief for Release of Animals or, in the Alternative, Stay of Disposal of Animals and Request for Emergency Hearing in the District Court. The District Court granted the motion in part, and issued an order on September 1, 2015 prohibiting the Humane Society from taking any action regarding the animals "inconsistent" with Mr. Rohrer's property rights, until the conclusion of all legal actions and appeals that involve the disposition of the animals. Because Mr. Rohrer's appeal of the denial of his Petition for Return of the animals was still pending in the Circuit Court, the District Court declined to hold a hearing.

*Appeal of Denial of the Petition for Return*

The Circuit Court held a hearing on the appeal on December 11, 2015. Mr. Rohrer challenged the substantive decision of the District Court – *i.e.*, whether the Humane Society's possession of the animals was actually necessary for the animals' health – as well as the procedures used by the Humane Society under CR §10-615 and in relation to the December 2014 agreement. Among other things, Mr. Rohrer argued that the Humane Society's invocation of its authority to remove animals under CR §10-615 was improper because, at the time it gave him notice of a seizure under the statute, the animals were already in the custody of the State under the search warrant and there was no "necessity" to seize them at that time. The Humane Society, in response, pointed to the evidence of the conditions on Mr. Rohrer's farm in late 2014, argued that its procedure in seizing and

19

holding the animals was lawful, and denied any legal significance of its December 2014 agreement with Mr. Rohrer.

In a written opinion dated May 6, 2016, the Circuit Court upheld the District Court's denial of the Petition for Return. The Circuit Court concluded that the District Court ruling "was not 'clearly erroneous'. . . that the animals were being well cared-for by the Humane Society, and it was not in the best interests of the animals to return their custody to [Mr. Rohrer]." The Circuit Court did not address the fact that the District Court's decision not to return the animals was premised in part on the fact that criminal charges related to the same animals were pending at the time of the District Court decision. By the time the Circuit Court issued its decision, the criminal charges had been resolved and the animals had been released from seizure in connection with that proceeding. It thus appears that the Circuit Court was focused on the merits of the District Court ruling at the time of that ruling.

Mr. Rohrer petitioned this Court for a writ of *certiorari,* which we granted.

*Related Pending Litigation*

Mr. Rohrer has brought a replevin action for return of the animals, but that action has been stayed pending the resolution of this appeal. Case No. 21-C-15-055661 (Circuit Court for Washington County).

# II

## Discussion

Mr. Rohrer has presented three issues for review. The first two issues concern the predicate for seizure or removal of an animal from its owner based on allegations of animal cruelty:

> (1) May an officer of a humane society seize an animal under CR §10-615 when that animal is already in State custody pursuant to a search and seizure warrant?

> (2) Must the seizure of an animal by an officer of a humane society under CR §10-615 be justified by conditions existing at the time of seizure, or may it be based on conditions previously observed?

The third issue concerns the application and effect of the process created by the statute for the possible return of the animal to its owner:

> (3) When an owner of a seized animal files a petition for return of the animal under CR §10-615(d) and the petition is denied, how does that ruling affect the owner's rights with respect to the animal?

## A.   *Standard of Review*

We have jurisdiction of this case pursuant to Maryland Code, Courts & Judicial Proceedings Article, §12-305, as we are asked to review a final judgment of the Circuit Court on appeal from the District Court's decision denying Mr. Rohrer's Petition for Return of animals under CR §10-615(d). The Circuit Court conducted its review on the record pursuant to Maryland Rule 7-113 and affirmed the decision of the District Court.

21

When an action has been tried without a jury, as in this case, an appellate court is to review the case on both the law and the evidence. Maryland Rule 8-131(c). The fact findings of the trial court are not to be set aside unless clearly erroneous. *Id*. However, the appellate court does not accord any special deference to the legal conclusions of the trial court or its application of the law to the facts. *Cunningham v. Feinberg*, 441 Md. 310, 321-22 (2015). A circuit court is to apply the same standard of review when it reviews a District Court decision on the record. Maryland Rule 7-113(f); *see Friendly Finance Corp. v. Orbit Chrysler Plymouth Dodge Truck, Inc.,* 378 Md. 337, 342-43 & nn.4-5 (2003).

The three issues raised by Mr. Rohrer concerning the application of CR §10-615 are purely legal in nature. Accordingly, we shall consider them without according deference to the decisions of the District Court or Circuit Court.

### B. Authority for a Humane Society to Take Possession of an Animal under CR §10-615

To address the questions before us, it is useful first to sketch out the legal context in which they arise – in particular, the provisions, purpose, and application of CR §10-615.

1.      Statutory Text

The statute provides in pertinent part[14]:

§10-615. Care of mistreated animal.

---

[14] We omit Subsection (g) of the statute, which pertains only to the statute's enforcement in Baltimore County and, accordingly, is not pertinent to this case, which concerns enforcement in Washington County.

(a) *Court-ordered removal*. If an owner or custodian of an animal is convicted of an act of animal cruelty, the court may order the removal of the animal or any other animal at the time of conviction for the protection of the animal.

(b) *Seizure.* (1) An officer or authorized agent of a humane society, or a police officer or other public official required to protect animals may seize an animal if necessary to protect the animal from cruelty.

(2)(i) An animal that a medical and scientific research facility possesses may be removed under this subsection only after review by and a recommendation from the Department of Health and Mental Hygiene, Center for Veterinary Public Health.

(ii) The Department of Health and Mental Hygiene shall:

1. conduct an investigation within 24 hours after receiving a complaint; and

2. within 24 hours after completing the investigation, report to the State's Attorney for the county in which the facility is situated.

(c) *Impounded animal*. (1) If an animal is impounded, yarded, or confined without necessary food, water, or proper attention, is subject to cruelty, or is neglected, an officer or authorized agent of a humane society, a police officer, another public official required to protect animals, or any invited and accompanying veterinarian licensed in the State, may:

(i) enter the place where the animal is located and supply the animal with necessary food, water, and attention; or

(ii) remove the animal if removal is necessary for the health of the animal.

(2) A person who enters a place under paragraph (1) of this subsection is not liable because of the entry.

(d) *Notification of owner*. (1) A person who removes an animal under subsection (c) of this section shall notify the animal's owner or custodian of:

(i) the removal; and

(ii) any administrative remedies that may be available to the owner or custodian.

(2) If an administrative remedy is not available, the owner or custodian may file a petition for the return of the animal in the District Court of the county in which the removal occurred within 10 days after the removal.

(e) *Stray*. An animal is considered a stray if:

(1) an owner or custodian of the animal was notified under subsection (d) of this section and failed to file a petition within 10 days after the removal; or

(2) the owner or custodian of the animal is unknown and cannot be ascertained by reasonable effort for 20 days to determine the owner or custodian.

(f) *Limitations*. This section does not allow:

(1)  entry into a private dwelling; or

(2)  removal of a farm animal without the prior recommendation
     of a veterinarian licensed in the State.

CR §10-615(a)-(f).[15]

This case does not present any issue under Subsection (a) or Subsection (f) of the statute. Subsection (a) authorizes a court to order removal of an animal from its owner following a conviction for animal cruelty. Although Mr. Rohrer was ultimately convicted

---

[15] For convenience, we have included the caption and catchlines, as the Legislature (as opposed to a legal publisher) included them when the statute was most recently re-codified. Chapter 26, §2, Laws of Maryland 2002. However, the captions and catchlines are not regarded as evidence of legislative intent. *See* Maryland Code, General Provisions Article, §1-208. For reasons spelled out later in this opinion, one of the catchlines may have led the parties and courts below slightly astray as they attempted to construe this somewhat cryptic statute. *See* Part II.B.2.i of this opinion below.

of five counts of animal cruelty, the District Court did not order any animals to be taken from him as a result of those convictions.[16] Rather, it explicitly ordered that the animals were "released from seizure" in connection with the criminal case. There is also no issue under Subsection (f), which requires approval of a veterinarian to seize a farm animal and which limits the statutory authority with respect to entry in a private dwelling. It appears to be undisputed that, in connection with the execution of the search and seizure warrant, a veterinarian recommended removal of the animals and that the seizure of Mr. Rohrer's farm animals did not involve entry into a private dwelling.

Subsections (b) and (c) of the statute both relate to the predicate for seizure or removal of an animal by a humane society officer. Both subsections were cited by the Humane Society in the notice of "seizure/removal" that it provided to Mr. Rohrer two months after execution of the search warrant. Those subsections thus relate to the first two questions in this appeal.

Subsections (d) and (e) both concern the procedure for seeking the return of an animal that has been seized or removed under the statute. Those subsections relate to the third question before us concerning the effect of a denial of a petition for return.

---

[16] Nor did the court prohibit him "from owning, possessing, or residing with an animal" as a condition of probation, as it could have done pursuant to CR §10-604(b)(3).

25

2. The Predicate for Seizure or Removal of an Animal

i. "Seize" v. "Remove" v. "Impound" – Statutory Text

During the course of this litigation, there has been some debate over the use of various forms of the words "seize," "remove," and "impound" in the statute and whether the Humane Society's action was best described by one or the other of those verbs. There is also some confusion whether those terms are used in the statute simply as synonyms for one another or to denote a distinction to which the courts should attach significance.

CR §10-615 could be read as authorizing several different methods by which an officer of a humane society may deal with a mistreated animal. For example, Subsection (b) of the statute authorizes an officer to "seize" an animal. Subsection (c) of the statute describes circumstances under which such an officer may "remove" an animal. Subsection (c) also refers to an "impounded" animal, and both Mr. Rohrer and the Humane Society have asserted, at times, that the Humane Society had "impounded" Mr. Rohrer's animals under the statute, rather than "seized" them. The statute does not define these words. In order to answer the questions before us about the predicate for taking action under Subsections (b) and (c), it is worth clarifying whether these verbs refer to the same action or not.

We can distinguish the significance of "impound" with a careful reading of the statutory text. As is evident, a form of that word – "impounded" – appears only in Subsection (c)(1) as one of three participles describing the location and condition of an animal prior to action by a humane society officer – "*impounded*, yarded, or confined

26

without necessary food, water, or proper attention …." The term does not refer to the action taken by a humane society officer in response to those conditions. Thus, strictly speaking, at least insofar as CR §10-615 is concerned, the statute does not authorize a humane society officer to "impound" an animal, but rather to rescue an "impounded" animal in certain circumstances.

The inclination to refer to a humane society as "impounding" an animal under CR §10-615 is understandable. A reader of CR §10-615 might be misled by the catchline for Subsection (c) ("Impounded animal"), and assume that it expresses a parallel meaning to the catchlines for Subsection (a) ("Court-ordered removal") and Subsection (b) ("Seizure"). It may also be that the notion that a humane society "impounds" an animal under Subsection (c) has arisen because that verb is used in other statutes to refer to an action taken by an individual or an animal control unit that captures a stray animal. *See* CR §10-617 (detailing procedures for an animal control unit to dispose of domestic animals of unknown ownership that have been "impounded" by the unit);[17] AG §3-603 (authorizing the owner of an "enclosure" to "impound" a stray animal that trespasses on the enclosure).

The term "impound" thus has no special significance for resolution of the issues in this case under CR §10-615. However, the terms "seize" and "remove" are both used in the statute to describe actions that may be taken by an officer. Subsection (b)(1) of the statute authorizes an officer to "seize" an animal "if necessary to protect the animal from

_____

[17] In the vernacular, the "dog pound."

cruelty." In describing special procedures for the seizure of an animal from a research facility, Subsection (b)(2) appears to use the verb "remove" as a synonym for "seize." In addition, Subsection (c) authorizes an officer to "remove" an animal in circumstances seemingly similar to those described in Subsection (b)(1) – when the action is "necessary for the health of the animal." In the context of the rest of Subsection (c), "remove" appears to refer to a seizure of an animal that is already confined in some way, as opposed to running free. An excursion into its legislative history confirms that the two terms are essentially used as synonyms.

ii.     "Seize" v. "Remove" – legislative history

Most of the legislative enactments that created the provisions of CR §10-615 pertinent to this case occurred before the General Assembly regularly compiled and preserved bill files. While we lack some of the legislative materials typically referenced for construing more recent legislation, what does exist is informative as to the development of CR §10-615.

*1955 – Original version of the statute*

The predecessor of CR §10-615 was first enacted in 1955.[18] Chapter 278, Laws of Maryland 1955, *then codified in* Article 27, §§86, 87. The original proposal went through more than one iteration before it was passed.

---

[18] Earlier statutes had provided for an officer of a humane society to take possession of an abandoned animal and dispose of it. *See* Chapter 456, Laws of Maryland 1900, *then codified at* Article 27, §46T, *later recodified at* Article 27, §§86 (1951 Code). Another early statute provided for the issuance of a search warrant to a peace officer "in order to

*Proposed legislation.* As it was originally introduced, the 1955 bill would have authorized an officer of a humane society or a police officer to "take possession" of an animal if necessary "to protect [the] animal from neglect and/or cruelty." Senate Bill 284 (1955). The bill would also have authorized an officer to provide necessary sustenance to an animal "impounded, yarded, or confined … without necessary food, water or proper attention" or to remove the animal from that location, if necessary "for the health of the animal." *Id*. The bill provided that the officer would not be liable for entering the property. *Id.* "In all cases" the owner or custodian of the animal, if known, was to be "immediately" notified of the officer's action. *Id*. If the owner or custodian was not known and could not be located "with reasonable effort," the animal was to be treated as a stray. *Id.* Finally, the bill provided that the owner of the animal would be responsible for the expenses incurred by the humane society in caring for the animal and that the humane society could recover that debt by selling the animal after obtaining a judgment for that purpose. *Id*.

*Amendments.* As the bill proceeded through the Legislature, it was amended in several key respects that appear to reflect a concern for the property rights of the owner or custodian of the animal. First, the bill was amended to limit the general authorization for an officer to "take possession" of a mistreated animal only to situations where the owner or custodian had been convicted of animal cruelty. *See* Chapter 278, Laws of Maryland

discover evidence of guilt" in an animal cruelty case, but did not explicitly authorize the seizure or removal of an animal. Chapter 527, Laws of Maryland 1902, *then codified at* Article 27, §46L, *later recodified at* Article 27, §87 (1951 Code).

29

1955. The authorization for an officer to enter property and remove an animal that was confined without proper sustenance was limited to circumstances when the owner or custodian "cannot be found." *Id.* Another amendment further limited the officer's authority to enter on property, and the corresponding immunity from liability – that amendment provided that the statute did not authorize entry into a "private dwelling." *Id.* Apparently in light of the fact that entry on property for removal of a mistreated animal was now premised on the fact that the owner could not be found, another amendment eliminated the requirement for immediate notification of the owner, but instead required notification if the owner was "subsequently located." *Id.* A related amendment clarified that the "reasonable efforts" to locate an absent or unknown owner should continue for 30 days before the animal would be considered a stray. *Id.*

*Enacted statute.* As amended and ultimately passed, the original 1955 version of the statute read as follows:

> 86. Whenever the owner or custodian of an animal is convicted of any act of cruelty thereto and subsequently it becomes necessary, in order to protect said animal from further neglect and/or cruelty, any officer of an animal humane society or any police officer may *take possession of it.* When an animal is impounded, yarded, or confined, and continues without necessary food, water or proper attention, and the owner or custodian thereof cannot be found, any officer of an animal humane society or any police officer *may enter into and upon any place* in which the animal is impounded, yarded, or confined, and supply it with necessary food, water, and attention, so long as it there remains, or, if necessary for the health of the animal, *may remove such animal, and not be liable to any action for such entry. In all cases* the owner or custodian of such animal, if subsequently located shall be notified of such action by the person *taking possession* of the animal. If the owner or custodian continues to be unknown and cannot with reasonable effort be ascertained for a period of thirty days, such animal

30

shall be held to be an estray and be dealt with as such, provided however, that nothing in this section shall be construed as permitting the entry into a private dwelling.

87. The necessary expenses for food and attention given to an animal under the preceding section, may be collected from the owner thereof, and the animal shall not be exempt from levy and sale upon execution issued upon a judgment therefor.

Chapter 278, Laws of Maryland 1955, *codified at* Article 27, §§86, 87 (1955) (emphasis added).

The statute thus allowed for separation of an animal from its owner or custodian by a humane society officer or police officer in two situations: (1) an officer could "take possession" of the animal upon the conviction of the owner or custodian of animal cruelty if there was a need to protect the animal from further abuse or neglect and (2) an officer could "remove" an animal that was "impounded, yarded, or confined" without necessary food, water, or care when the owner could not be found and it was necessary to remove the animal to provide those necessities; in such a case, the officer would not be liable for trespass. In both instances, the statute appeared to leave it to the judgment of the officer as to whether the requisite conditions of abuse or neglect existed. The statute further provided that "[i]n all cases" the officer "taking possession" of the animal was to notify the owner or custodian of the animal.

Thus, removal of an animal from a place of confinement was simply one specific way in which an officer could, pursuant to the statute "take possession" of a mistreated animal from an owner or custodian who could not be located. Although the 1955 statute required notification of the owner or custodian, it was silent on whether – or how – that

31

individual could retrieve the animal.  Nor did the statute purport to address the effect of a seizure on ownership of the animal, if the owner was known, although it appeared to regard the animal as property of the owner that was subject to levy and execution to reimburse the humane society for its expenses.[19]

*1963 amendment – court order upon a conviction*

A few years later, in 1963, the General Assembly amended the provision predicated upon a conviction of animal cruelty to confer discretion on the *court* – as opposed to the officer – to order removal of the animal from its owner or custodian at the time of conviction.  If the court elected not to do so at the time of conviction, the statute continued to allow an officer to "take possession" of the animal at a later time, if necessary to protect

---

[19] As the text of the statute indicates, if the owner or custodian remained unknown after 30 days, the animal was to be treated as "an estray" – *i.e.*, a stray animal – and dealt with accordingly.  The statute did not define "stray" or "estray."  The common law deemed an animal a stray when it was wandering at large "without restraint or confinement" and allowed anyone to seize such animals.  3B C.J.S. *Animals* §§248, 251, 268.

Currently, State and local law may also provide some direction as to the disposition of a stray animal.  Certain statutes provide procedures for the disposition of a stray animal when the stray is either (1) trespassing and of known ownership (AG §3-603) or (2) "impounded" by an "animal control unit" (CR §10-617).  Several Maryland county codes – including the code of Washington County, where Mr. Rohrer's farm is located – also allow local governmental units and their agents to "impound" animals "found at large" and set forth the procedures to be followed after seizure.  *See, e.g.*, Animal Control Ordinance of Washington County, Maryland, §39, *available at* http://www2.washco-md.net/washco_2/pdf_files/legal/_ACO%20eff%201-10-11.pdf [https://perma.cc/BUY9-RPVF].

the animal from further neglect or cruelty. Chapter 718, Laws of Maryland 1963.[20] The statute continued to provide for removal of confined animals when necessary and for notification of the owner or custodian "in all cases," but remained silent on any process for return of the animal or the effect of the officer's action on an individual's ownership interest in the animal.

*1975 amendment – extending basis for removal and adding return procedure*

In 1975, the General Assembly amended the statute in four respects significant to this case. Chapter 716, Laws of Maryland 1975. Those amendments enhanced the authority of an officer to take possession of a mistreated animal, further defined the process to be accorded the owner of the animal, and established a special condition for seizure of an animal from a farmer.

First, the general authority of an officer to "take possession" of an animal no longer depended upon the prior conviction of the owner or custodian, but was authorized "whenever it becomes necessary to protect any animal from neglect or cruelty."

Second, the 1975 amendment expanded the circumstances under which an "impounded, yarded, or confined animal" could be removed from that location by an officer. While such an action could still be premised on a lack of "necessary food, water or proper attention," an officer could now also take action if the animal was otherwise

_____

[20] Since their original enactment in 1955, the two sections had been recodified as Article 27, §§67, 68 as part of the 1957 Code.

"cruelly treated or neglected." And this authority was no longer limited to situations where the owner could not be found.

Third, the 1975 amendment provided, for the first time, some direction in the statute with respect to the content of the notice to an owner or custodian and the procedures for seeking return of an animal. It reduced the requisite period for a reasonable search for an unknown owner or custodian from 30 days to 20 days. It directed that the owner or custodian be provided notice not only of the fact that the officer had taken possession of the animal, but also of "any administrative remedies." If no administrative remedy was available, the statute now created its own judicial remedy – it authorized the owner or custodian to file "within ten days, . . . a petition for return of the animal in the district court of the county in which the removal occurred." If the owner or custodian failed to file such a petition, the animal would be regarded as a stray and disposed of accordingly.[21]

---

[21] The 1975 amendment thus elaborated the notice requirement and provided a default process for a hearing. The attention paid to the notice and hearing provision in the 1975 amendment may reflect the concern of courts and lawmakers during the 1970s with defining and vindicating the constitutional right to procedural due process in various contexts. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254 (1970) (termination of welfare benefits); *Fuentes v. Shevin*, 407 U.S. 67 (1972) (state replevin statutes); *Board of Regents v. Roth*, 408 U.S. 564 (1972) (termination of non-tenured professor at state university); *Perry v. Sindermann*, 408 U.S. 593 (1972) (termination of tenured professor at state universities); *Goss v. Lopez*, 419 U.S. 565 (1975) (public school suspension of a student); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (termination of disability benefits).

Fourth, the 1975 law also added a special condition for removal of a *farm* animal – such an animal could not be removed without the recommendation of a licensed veterinarian.[22]

The statute continued to provide that a humane society could collect from the owner the expenses of caring for an animal and that the animal was subject to levy and sale upon execution of a judgment for those expenses. Article 27, §68 (1975).

Over the next few decades, the law underwent several other minor revisions not pertinent to our discussion.[23]

---

[22] In addition to the amendments made to the seizure statute, the 1975 law made several notable amendments to other parts of the animal cruelty laws. In particular, prior to passage of the 1975 law, the animal cruelty law had described various ways in which an individual with charge or custody of an animal could commit the misdemeanor offense of animal cruelty, including by failing to provide an animal with "food, drink, air, space, shelter, or protection from the weather." The 1975 amendment extended the definition of that crime to include not only a complete deprivation of those necessities, but also other forms of inhumane treatment, such as a failure to provide "*nutritious* food *in sufficient quantity*, *necessary veterinary care, proper* drink, air, space, shelter, or protection from the weather." (emphasis added). At the same time, the General Assembly tempered this extension of the criminal provision by excluding from its reach certain "customary veterinary practices" and other "normal human activities" in which "the infliction of pain to an animal is purely incidental and unavoidable." (*e.g.,* processing animals for food). These provisions now appear in CR §10-603 and CR §10-604(a)(5).

[23] Chapter 803, Laws of Maryland 1976 (changing both references to "officer of an animal humane society" to "officer or authorized agent of an animal humane society"); Chapter 647, Laws of Maryland 1978 (indicating that, in Baltimore County, the law should be enforced by that county's Bureau of Animal Control); Chapter 528, Laws of Maryland 1984 (providing that animals in research facilities cannot be removed without review by the Department of Health and Mental Hygiene's Veterinary Medicine Division); Chapter 482, Laws of Maryland 1985 (relating to enforcement of the law in Baltimore County); Chapter 175, Laws of Maryland 1998 (explicitly authorizing a licensed veterinarian to enter

*2002 – Code Revision*

In 2002, the animal cruelty laws were recodified as part of the new Criminal Law Article and the provisions concerning seizure and removal of an animal were largely codified in CR §10-615. Chapter 26, Laws of Maryland 2002. The revisor's note to that revision indicates, as is typically the case with code revision, that CR §10-615 is "new language derived without substantive change" from the prior version of the statute. It is notable, however, that the provision concerning levy and sale of an animal by a humane society to cover its expenses, which had always been tethered to the predecessor of CR §10-615, was now incorporated in a different statute concerning disposal of domestic animals by an animal control unit. *See* CR §10-617(d)(3). As explained later in this opinion, this may have been a drafting error by the code revisors. *See* footnote 38, below.

The statute has not undergone any significant amendment since that time.[24]

### iii.  Summary

Prior to the 2002 recodification, the statute authorized certain persons – "an officer or authorized agent of a humane society, or a police officer or other public official required to protect animals" – to "take possession" of an animal "[w]henever it becomes necessary,

property with a humane society or police officer for the purpose of treating or removing an abused animal on the property).

[24] Since the 2002 recodification, the Legislature has made only one minor amendment to CR §10-615 that is not pertinent to this case. *See* Chapter 25, Laws of Maryland 2004 (changing reference to the "Division of Veterinary Medicine" to the "Center for Veterinary Public Health").

in order to protect [the animal] from neglect or cruelty." As the revisor's note indicates, this provision became CR §10-615(b)(1), which states that those same persons[25] have the authority to "seize" an animal "if necessary to protect the animal from cruelty." Therefore, code revision simply substituted the verb "seize" for "take possession of" and "seize," as used in Subsection (b) (1), means "take possession."

The focus of Subsection (c) of the statute is primarily to authorize entry into an area where a mistreated animal is "impounded, yarded, or confined" without subjecting the officer or other person assisting the officer (such as a veterinarian) for liability for trespass for that entry. This subsection only incidentally authorizes "removal" of the animal from that location if necessary to provide the requisite care for the animal. This subsection does not appear to be authority, independent of Subsection (b), for an officer to take possession of an animal; rather, it directs an officer to exercise the power conferred by Subsection (b) in certain circumstances. This provision operates essentially to exempt an officer and others involved in a seizure from liability for trespass while rescuing neglected or mistreated animals that are confined.

---

[25] For convenience, we shall use the generic term "officer" in this opinion to refer generally to an individual authorized to take action under CR §10-615.

37

3. The Notice Requirement and Petition for Return

    i. Notice Requirement

Subsection (d)(1) states that "[a] person who removes an animal under subsection (c) of this section" must "notify the animal's owner or custodian" of "the removal" and "any available administrative remedies." Read literally, this language would apply only to mistreated animals that are removed from their place of confinement under Subsection (c) and not to other animals seized pursuant to Subsection (b). However, as is evident from our recitation of the legislative history of the statute, the notice requirement, since the inception of the statute, was intended to apply "in all cases," and removal under Subsection (c) is simply one circumstance in which an officer exercises the authority conferred by Subsection (b). Nor is there any indication in the legislative history that the General Assembly subsequently intended to limit the notice requirement.

In our view, the placement of the notice requirement in Subsection (c) as part of the 2002 recodification of the statute was not intended to effect a substantive change in the breadth of the notice requirement. In other words, the statute requires notice to a known owner or custodian *any time* an officer takes possession of a mistreated animal under CR §10-615 in order to protect the animal. To read the statute otherwise could raise significant due process issues. *See, e.g., Porter v. DiBlasio*, 93 F.3d 301 (6th Cir. 1996) (holding that a state may not terminate an individual's interest in seized animals without notice and a hearing).

38

ii.     Judicial Return Remedy

As the statutory text indicates, the statute incorporates whatever administrative remedy may exist in the particular jurisdiction for the return of a seized animal. The statute's judicial remedy is a default remedy that becomes available only if no administrative remedy exists. Unfortunately, as the District Court noted in this case, the statute provides no explicit guidance as to the standard by which a petition for return should be decided, or even who has the burden of proof. It seems fair to infer that the seizing party would have the burden of justifying the legality of the seizure and its retention of the animal by establishing the statutory predicates for a seizure – that the seizure was "necessary to protect the animal from cruelty" or "necessary for the health of the animal."

The legislative history, as well as common sense, likewise informs our reading of the deadline for invoking the judicial remedy. Subsection (e)(1) literally requires an owner who is notified of the seizure of an animal to file a petition for return of the animal "within 10 days after removal" of the animal, not within 10 days after *notice* of the removal. Failure to file a petition means that the animal will be deemed a stray and disposed of accordingly. If this provision were interpreted literally, an owner who was notified of the seizure of an animal 11 days after the seizure could never file a timely petition for return and exercise the remedy of which he or she was being notified. The legislative history demonstrates

39

that this nonsensical result is not what the Legislature intended.[26]  Prior to the 2002 code revision, the statute stated that "the owner or custodian of [the seized] animal shall be notified … [and] may file within ten days, if no administrative remedy is available, a petition for return of the animal…."  Maryland Code, Article 27, §67 (1998).  Thus, the triggering event for the beginning of the time period for filing a petition was the notification of the owner or custodian.  As previously noted, the 2002 code revision was not intended to effect a substantive change in this provision.  Therefore, we read Subsection (e)(1) as imposing a similar deadline – *i.e.*, an owner or custodian must file a petition for return no more than 10 days after the seizing party provides notice under Subsection (d)(1), or the animal will be "considered a stray" pursuant to Subsection (e)(1).

4.     Summary

Our review of the statute, in light of its legislative history, yields the following conclusions:

- Subsection (b)(1) confers on an officer the authority to seize – *i.e.*, take possession of – a mistreated animal if necessary to protect the animal from cruelty.

- Subsection (c) provides some specific direction as to seizure under specific circumstances – when removal of an animal from a place of confinement is necessary for the health of the animal.  It absolves an officer of liability for trespass when entering an area to care for, or to take possession of, a mistreated animal.

---

[26] *See Breck v. Maryland State Police*, 452 Md. 229, 248 (2017) ("In our task of statutory interpretation, we avoid any construction of a statute that would lead to illogical, absurd, or anomalous results.") (citation and internal quotation marks omitted).

- Whenever an animal is seized by an officer under the statute, the officer must notify the animal's owner or custodian as prescribed in Subsection (d)(1), if the owner or custodian is known, and otherwise must make reasonable efforts to locate the owner or custodian for at least 20 days in order to provide notice of the seizure.

- The owner or custodian may seek return of the animal pursuant to any available administrative remedy. If there is no administrative remedy available, the owner or custodian has 10 days from the time of the notice to file a petition for return of the animal pursuant to Subsection (d)(2). A failure to do so results in the animal's treatment as a stray under Subsection (e)(1).

- While the statute is silent on how a petition for return is to be litigated, it appears appropriate for the court to require the seizing party to establish that seizure was – and remains – necessary to prevent cruelty or to maintain the health of the animal.

## C. *Whether the Timing of the Notice of the Seizure Was Appropriate*

Mr. Rohrer argues that the Humane Society did not satisfy the predicate for seizure of his animals under CR §10-615 when it gave notice of its action for two reasons, both related to the timing of the notice provided by the Humane Society. First, he asserts that the seizure and notice were defective under CR §10-615 because the animals were no longer in his custody at the time of the January 2015 notice, but rather were in State custody – indeed, under the care of the Humane Society itself – pursuant to the criminal search and seizure warrant. Second, he contends that the conditions that allegedly justified seizure under the statute – the conditions observed by Officer Mowery and Dr. Wurmb at the farm in November 2014 – no longer existed at the time of the January 2015 notice. One contention is that the Humane Society acted too soon – it should have waited until the

animals were released to Mr. Rohrer from State custody. The other is that the Humane Society acted too late – the notice was based on past conditions remote in time.

       1.      Notice of Seizure by Humane Society while Animals Are in State Custody

As noted earlier, the notice of "seizure/removal" under CR §10-615 posted by Officer Mowery appeared to state that the animals had been seized and removed under that authority in November and December 2014, although she later testified in the District Court that the Humane Society did not decide to invoke its authority under the statute until shortly before she posted the notice at Mr. Rohrer's farm on January 20, 2015.[27] It is undisputed that the animals were physically removed from Mr. Rohrer's farm under the authority of a criminal search and seizure warrant during November and December 2014.[28] As the State's agent, the Humane Society took custody of those animals and placed them with foster farms.[29]

---

[27] CR §10-615(b) may well be the authority for a humane society officer to participate in the execution of a search and seizure warrant.

[28] Because the officers' entry on Mr. Rohrer's farm and the physical seizure of his animals was authorized by a criminal search and seizure warrant, we need not consider whether a seizure under CR §10-615 without a warrant could be justified as a search under exigent circumstances, as an administrative search of a pervasively regulated business (*see New York v. Burger*, 482 U.S. 691 (1987)), or under some other exception to the warrant requirement.

[29] The parties, as well as the courts below, appear to have assumed that the animals were seized and held as "evidence" of the alleged animal cruelty violations. There are several reasons to question that assumption and at least one reason to believe that the warrant itself was based in part on the authority granted by CR §10-615.

Mr. Rohrer argues that, because the animals were formally in the custody of the State pursuant to the search warrant as of the January 2015 notice, they were not subject to seizure and removal from their owner at that time by the Humane Society pursuant to CR §10-615. In Mr. Rohrer's view, there was no risk of harm to the animals while they were in the custody of the State (indeed, under the supervision of the Humane Society itself) and the statute does not authorize the Humane Society to seize animals *from* the State. He argues that the Humane Society could not act under the statute unless and until the animals were released to him at the conclusion of the criminal case. In addition, he asserts that the Humane Society's premature notice under CR §10-615 unfairly forced him to litigate the

It is unclear from the record in this case whether the seized animals were presented in court or visited by the judge who presided at the criminal trial, although we suspect we know the answer. The criminal trial was held in May and July 2015, at least five months after seizure of the animals, which presumably were well cared-for in the interim. Their appearance and condition at the time of trial might have had little relation to their condition at the time of seizure.

We do have the record of the earlier hearing on the Petition for Return under CR §10-615 in February and March 2015. At that hearing, the parties did not physically present the animals to the court for inspection, but rather relied on testimony and photographs of the animals and the farm from November and December 2014, which presumably were better evidence of whether the statutory conditions were met at the time of seizure.

It is also notable that, while the search warrant authorized executing officers generally to seize "evidence" of animal cruelty violations, it also specifically directed them to "seize any animal found to be deprived of nutritious food and water, at the recommendation of the veterinarian on the scene" – a provision apparently designed to conform with the requirements of CR §10-615(c) & (f)(2).

43

allegations of animal cruelty in a civil context while he was a defendant in a parallel criminal proceeding concerning the same allegations.

In our view, the posting of the notice may be best understood as notice of the Humane Society's intent to keep the animals after resolution of the criminal case. When property is in State custody pursuant to a warrant it is "subject to the order of the court having criminal jurisdiction of the offense."[30] At the conclusion of the criminal case, property properly seized under a search and seizure warrant may simply be returned to the person from whom it was seized. Maryland Code, Criminal Procedure Article ("CP"), §1-203(c). Alternatively, the owner may seek return of the property from the State if there is no further need for retention of the property for law enforcement purposes. CP §1-203(d). Although such possession by the State "in no manner denies or affects the title of the true owner, but simply postpones his right of possession until the exigencies of the prosecution are satisfied,"[31] the court's authority over the property generally is not subject to interference in another proceeding.[32] CR §10-615 does not create an exception to these principles.

---

[30] *Outerbridge Horsey Co. v. Martin*, 142 Md. 52, 56 (1923).

[31] *Good v. Board of Police Comm'rs of City of Baltimore*, 137 Md. 192, 196 (1921) (quoting *Commission & Stock Co. v. Moore*, 13 App. D.C. 78 (1898)).

[32] *Dail v. Price*, 184 Md. 140, 144 (1944) ("[W]hile the criminal case is pending, the articles cannot be replevied because they are *in custodia legis*."); *Weiprecht v. Ripple*, 217 Md. 337, 350 (1958) ("A lien cannot be obtained on property *in custodia legis*."); *Outerbridge Horsey Co. v. Martin*, 142 Md. 52, 55 (1923) ("[W]hen a court acquires jurisdiction of goods, chattels, or money in one case, the orderly process of the court

44

It may well be reasonable in a particular case for a humane society to seek to maintain possession of animals seized under a search warrant regardless of the outcome of a parallel criminal case. There is a heightened standard of proof in criminal cases and even if that standard is met and the defendant is convicted, the court is not required to dispossess the defendant of an animal as part of the sentence. The humane society may decide that, regardless of the disposition of the criminal charges, removal of the animal from its owner will be "necessary to protect the animal from cruelty" or "necessary for the health of the animal." To the extent that the Humane Society in this case was concerned that a return of the animals to Mr. Rohrer at the conclusion of the criminal case would subject the animals to abuse or neglect, and believed that it should continue to possess and care for them, it was reasonable to provide Mr. Rohrer with notice of that position. In effect, such a notice functioned as a sort of detainer – much like an arrest warrant is lodged as a detainer against a person already incarcerated for other reasons.

Mr. Rohrer timely filed a Petition for Return in response to the January 2015 notice. The District Court held a hearing on that petition,[33] and made the eminently sensible

---

requires that it shall be permitted to determine the rights of the parties in that case, without the interference or interruption of a conflicting jurisdiction or of a separate and distinct action or proceeding.")

[33] Although it is not entirely clear from the transcript, it appears that the court and parties may have assumed that Mr. Rohrer bore the burden of proof on the Petition for Return. While a petitioner, as moving party, bears a burden of production of evidence, it is probably more appropriate to place the burden of persuasion on the Humane Society, as the statute sets forth a standard it must meet to effect a seizure.

decision not to affect the possession of the animals while the criminal case was pending. If a similar case were to arise in the future, it might well be preferable to defer any hearing and decision on a petition for return of an animal until after the conclusion of the criminal case – for several reasons. First, as was the case here, adjudication of the petition in that circumstance is unlikely to have any immediate effect on custody of the animal. Second, whether the statutory standard for removal of an animal from its owner or custodian – the need to protect the animal from cruelty or to preserve its health – exists should be measured not only as of the time of seizure, but also as of the time the animal would be released to the owner or custodian, which may be in the distant future, depending on the schedule of the criminal case. Third, litigation of the petition for return while parallel criminal charges are pending may be unfair to the owner or custodian. Finally, although it did not happen in this case, the pending parallel criminal proceeding may itself resolve disposition of the animals, rendering further litigation of a petition for return unnecessary.

Thus, we hold that a humane society officer may, while an animal is in State custody pursuant to a search and seizure warrant, notify the owner or prior custodian of the animal of an intent to take possession of the animal upon its release from State custody under the warrant. Nothing in CR §10-615 forecloses this reading, and this interpretation furthers the Legislature's intent of preventing animal cruelty by allowing an officer to assert proactively the authority to continue to possess (and care for) an animal that has already been seized in connection with a criminal investigation.

46

## 2. Reference to Past Conditions to Justify Seizure

The allegations of animal cruelty in this case related to the condition of the animals on Mr. Rohrer's farm as observed by Officer Mowery and Dr. Wurmb in late November 2014. The animals were removed from the farm in late November and early December 2014 pursuant to the search warrant. Thus, by the time of the notice of "seizure/removal" in late January 2015, the animals no longer lived under the allegedly deficient conditions. Indeed, by that time, the animals had been in the custody of the Humane Society itself (on behalf of the State) for at least six weeks. Unsurprisingly, nothing in the notice tied the Humane Society's decision to the circumstances of the animals at the time the notice was given.

Mr. Rohrer argues that the "conditions permitting removal under CR §10-615 did not exist" when the January 20, 2015 notice was given. Because the animals were at the Humane Society's foster farms at that time, and presumably in good care, Mr. Rohrer argues that seizure at that time could not have been necessary for the health of the animals.

In our view, an officer may rely on previously-observed conditions to justify seizure of an animal under CR §10-615. The physical act of taking possession of an animal need not be contemporaneous with the conditions on which the officer relies to take possession. Nothing in the statute requires that an officer seize a mistreated animal at the moment the officer first observes abuse or neglect. On the other hand, the age of the evidence of mistreatment is a relevant consideration for a court that must decide whether seizure by the officer was truly "necessary to protect the animal from cruelty" or "necessary for the health

47

of the animal." Just as the evidence establishing the probable cause supporting a search and seizure warrant may grow stale with the passage of time, the evidence allowing an officer to take action under CR §10-615 may, with the passage of time, become too attenuated to support that action. In the context of a criminal search warrant, staleness is assessed according to the circumstances of the particular case by factors such as the "passage of time, the particular kind of criminal activity involved, the length of the activity, and the nature of the property to be seized." *Patterson v. State*, 401 Md. 76, 92-93 (2007); *see also Greenstreet v. State*, 392 Md. 652, 674-77 (2006). Similar factors may be applied in assessing the timeliness of the justification for a seizure under CR §10-615.

As indicated in Part II.B.4 of this opinion, when an owner of an animal files a petition for return of the animal, a humane society has the burden of persuading the court that the seizure was – and remains – "necessary" under the terms of the statute. An owner may challenge the humane society's retention of the animals in two respects: (1) whether the statutory standard was satisfied at the time of seizure and (2) even if the standard was satisfied at the time of seizure, whether the humane society's continued possession of the animals remains "necessary."

The January 2015 notice, as amended in February 2015, clearly related the justification for the seizure to the conditions at the time the animals were removed from Mr. Rohrer's farm in November and December 2014. Effectively, the Humane Society related the notice of seizure under CR §10-615 back to the time of the seizure under the warrant. At the hearing on the Petition for Return, the Humane Society presented

48

testimony from Officer Mowrey and Dr. Wurmb about what they observed when Mr. Rohrer's animals were first seized in late 2014. The District Court clearly found this testimony credible and relevant, specifically adverting to it when making its ruling. Mr. Rohrer does not argue that the District Court's findings in this regard were clearly erroneous.

However, Mr. Rohrer was entitled to contest whether the Humane Society's continued possession of his animals was necessary to protect the animals from cruelty – or necessary for their health – at the time they would be released from State custody under the warrant. The District Court did not consider that question – understandably because the criminal charges remained pending at the time of its ruling and no one knew at that time when the criminal case would be resolved and when, if ever, the animals would be formally transferred from the State to the Humane Society. In our view, that remained an open question that neither the District Court nor the Circuit Court purported to decide.

Thus, the District Court properly considered the evidence concerning the conditions at Mr. Rohrer's farm at the time the animals were removed in November and December 2014 and, in light of the pending criminal case, did not reach the question of whether the requisite necessity supporting the Humane Society's possession of the animals continued to exist. In conducting an on-the-record appeal, the Circuit Court purported only to assess the merits of that decision as of the time it was made. Now that the criminal case has been concluded and the animals have been released from custody under the search warrant, the

49

District Court may consider the question of whether it remains necessary for the Humane Society to retain the animals to prevent abuse or neglect or to maintain their health.

**D.** ***Whether Denial of Petition for Return Affected Ownership Interest***

Finally, we turn to the legal effect of an adjudication of a petition for return of an animal. In denying Mr. Rohrer's Petition for Return, the District Court decided that it was best for the seized animals to remain under the care of the Humane Society while the criminal charges were pending and alluded to "the best interest of the animals." The Circuit Court apparently adopted the same standard when it affirmed the decision of the District Court and also referred to "the best interests of the animals." When Mr. Rohrer's counsel raised the question of the consequences of that decision for ownership of the animals, the District Court indicated its belief that the statute did not affect ownership and also noted the December 2014 agreement in which the Humane Society acknowledged Mr. Rohrer's continuing ownership of the animals. The District Court explicitly disclaimed any intention of deciding title to the animals and the Circuit Court implicitly seemed to take the same position.

*Whether the issue should be addressed*

Mr. Rohrer argues that denial of his Petition for Return did not affect his ownership of the animals while the criminal charges were pending. The Humane Society counters that the issue is not ripe for our review. However, the Humane Society took the position below that the denial of the petition, coupled with the conclusion of the criminal case (even though largely favorable to Mr. Rohrer), divested Mr. Rohrer of his interest in the animals.

50

It proceeded to dispose of half of the animals in its custody before that process was halted by the District Court.

The effect of the denial of the petition on ownership of the animals was certainly raised in the courts below and at least tentatively decided by the District Court. Accordingly, it was preserved for purposes of Maryland Rule 8-131(a). Moreover, to the extent that we agree with the District Court's disposition of the Petition for Return, it is important to indicate the significance of that disposition. Finally, the status of the animals apparently remains an issue in the pending replevin case and some guidance as to the effect of the denial of the Petition for Return may be useful to the court tasked with deciding that case.

*Whether the proceeding concerns a potential forfeiture*

Subsection (d)(2) of the statute allows the filing of a petition for return of an animal, but provides no explicit guidance on the nature of the proceeding that decides the merits of that petition.[34] Under one possible reading of the statute, adjudication of a petition for return would determine ownership of the animal. Under this view, granting the petition would keep title in – and return possession to – the owner; denying the petition would

---

[34] It is notable that a statute that authorizes the Maryland Horse Industry Board to take possession of mistreated horses pursuant to CR §10-615 provides additional guidance for the adjudication of a petition for return in that instance. *See* AG §2-716. An owner or custodian who files a petition for return is entitled to return of the horse if the owner or custodian (1) agrees to provide "proper attention" to the horse and (2) pays the costs and expenses involved in the seizure and maintenance of the horse. AG §2-716(c)(1).

transfer title to – and retain possession in – the Humane Society. Subsection (d)(2) would operate as a civil forfeiture statute.[35] This is the interpretation that was advocated by the Humane Society.

We reject that interpretation. First, "it has long been settled . . . that forfeitures are not favored in the law"[36] and are considered "harsh extractions, odious, and to be avoided when possible."[37] Second, Subsections (b) and (c) allow an officer only to "seize" – *i.e.*, "take possession of" – or remove an allegedly mistreated animal. As the District Court noted, the statute says nothing about transferring ownership of the animal.

Third, other parts of the statute do not appear to contemplate that a seizure effects a transfer of ownership. For example, at its inception, the legislation that is now codified at CR §10-615 provided that a humane society could recover its expenses through levy and sale of a seized animal following a judgment – giving the humane society a lien on property of the owner – *i.e.*, the animal. The premise for that procedure is that the animal still

---

[35] *See generally Bottini v. Department of Finance*, 450 Md. 177, 190-91 (2016) (explaining the history and operation of forfeiture law in the State). Maryland's criminal forfeiture statutes are codified in the Maryland Code, Criminal Procedure Article, Titles 12 and 13. They provide for the forfeiture of, among other things, illegal drugs and drug paraphernalia, CP §12-102, money involved with illegal gambling operations, CP §13-102, and guns used to commit certain crimes, CP §13-201. There is no provision in those laws for forfeiture of an ownership interest in an animal.

[36] *Prince George's County v. Vieira*, 340 Md. 651, 659 (1995).

[37] *State to Use of Frederick City Police Department v. One 1988 Toyota Pick-Up Truck Vin. JT4RN63A5J0211499*, 334 Md. 359, 375 (1994).

belonged to the owner.[38] Moreover, an owner of an animal retains that interest in the animal even if the animal becomes a stray.[39] Subsection (e) of the statute provides that failure to file a petition for return results in the animal's classification as stray. It would be illogical to read CR §10-615 as effecting forfeiture when a petition for return is *denied*, but not when a petition for return is *never even filed*.

Finally, we note that the petition process provided in Subsection (d)(2) is a default procedure that is available only "[i]f an administrative remedy is not available" in the particular jurisdiction. If this default process were construed to create a forfeiture, a seizure under CR §10-615 could result in a forfeiture in one jurisdiction while a similar seizure in another jurisdiction would not. It seems unlikely that the General Assembly would intend

---

[38] That provision remained in the statute when the petition for return process was added in 1975. As noted earlier, as part of the 2002 recodification this provision found its way into CR §10-617 concerning impoundment of domestic animals. This appears to have been a drafting error. Prior to the 2002 recodification, the lien provision appeared in former Article 27, §68 and explicitly cross-referenced former Article 27, §67 – the predecessor of CR §10-615. During the 1960s and 1970s, the General Assembly enacted two provisions concerning dogs and domestic animals, which were codified as §67A and §67B. Although §68 still clearly applied only to expenses incurred under §67 (*i.e.*, current CR §10-615), the code revisors elected to combine §68 with §67B in new CR 10-617 – a decision that appears to have been based on the physical proximity of §68 to §67B, as opposed to the explicit textual relationship of §68 to §67.

[39] *See, e.g., Brown v. State*, 236 Md. 505, 513 (1964) (noting that, because "stray domestic animals remain in the constructive possession of their *owner*," one may be convicted of larceny for fraudulently taking and carrying them away) (emphasis added); *Annapolis & E.R. Co. v. Baldwin*, 60 Md. 88, 91-92 (1883) (although an owner of a stray animal is liable for direct damages caused by the animal, the owner is not liable for consequential damages unless the plaintiff proves the owner negligently allowed the animal to stray).

such a result. We decline to read a forfeiture provision into CR §10-615 when the statute does not explicitly include one and when doing so appears to be at odds with some parts of the statute.

*The standard to be applied under CR §10-615(d)(2)*

We also do not adopt the label that the District Court attached to the standard it applied in deciding the Petition for Return, although that decision, and its apparent rationale, appear to be unassailable. The District Court and Circuit Court understandably felt at a loss for what standard to apply to decide the petition, as the statute is not explicit, and latched onto a familiar phrase – "best interests" – from family law.[40] *See Santo v. Santo*, 448 Md. 620, 626 (2016) (guiding principle in child custody disputes is "best interests of the child"). In our view, use of that label could be misleading. It was undisputed that most, if not all, of Mr. Rohrer's animals (other than some of the chickens, which the Humane Society did not remove from the farm) were destined for the slaughterhouse. From the perspective of the animal, any action that would take it closer to the slaughterhouse would not be in its "best interests." We shall refrain from using the phrase "best interests of the animals" lest the possession or return of farm animals under CR §10-615 should become confused with a child custody determination in family law.

---

[40] Neither of the parties in this case proposed or argued for application of a "best interests" standard.

54

In the context of a petition for return of animals under CR §10-615, we understand the District Court's use of the term "best interests" in this case as a shorthand for the statutory phrases "necessary to protect the animal from cruelty" and "necessary for the health of the animal." That is how the Legislature has phrased the prerequisite for seizure of an animal under Subsections (b) and (c). Logically, the owner is not entitled to return of the animals for the duration of that necessity. The court may decide that possession by the seizing party was once "necessary," but is no longer so (perhaps the owner or custodian has rectified the conditions justifying the initial seizure), which would mean that the owner or custodian would be entitled to return of the animal. Or the court may decide that possession by the seizing party was never – and is therefore currently not – "necessary," which would also result in a return of the animal. Or the court may decide that possession by the seizing party was and remains "necessary," which would mean that the humane society may retain the animal, at least as long as it is "necessary to protect the animal from cruelty or "necessary for the health of the animal."[41] But this does not effect a permanent transfer of ownership.

---

[41] The statute does not preclude the owner or custodian who has filed a timely petition from filing another petition for return in the District Court. Alternatively, the owner or custodian may file a replevin action against the seizing party. *See, e.g., Wallander v. Barnes*, 341 Md. 553, 561 (1996) ("Replevin may be said to be the appropriate remedy in all cases where the object of the suit is to recover possession of specific goods and chattels, to the *possession* of which the plaintiff claims to be entitled at the time of instituting the suit." (emphasis added) (internal quotation marks and citations omitted)).

In our view, the function of a proceeding on a petition for return is to determine who has the right to *possess* the animal in question – *i.e.*, to determine if possession of the animal by a humane society was and remains necessary under the statutory standard. Such a decision, however, does not affect an ownership right in the animal.

### III

### Conclusion

For the reasons explained above, we hold:

(1)  Although a humane society acting under CR §10-615 may not take possession of an animal that is already in State custody pursuant to a criminal search warrant, the humane society may notify the animal's owner or custodian of its intent to take possession of the animal under that statute upon the animal's release from State custody.

(2)  When a humane society takes possession of an animal pursuant to CR §10-615 based on the alleged abuse or neglect of the animal, the conditions that justify the seizure of the animal need not be precisely contemporaneous with the seizure. The temporal relationship between alleged circumstances of abuse or neglect and the time that the humane society takes possession of the animal, however, is relevant to a determination whether the humane society's action is "necessary to protect the animal from cruelty" or "necessary for the health of the animal." In any event, in a case where an animal is seized pursuant to a criminal search warrant based on a finding of probable cause of violations of the animal cruelty statute, the humane society may take possession of the animal upon release from custody under the warrant based on the same allegations that supported seizure

56

under the warrant if it believes that the statutory standard continues to be met at the time of release. The humane society may be required to justify that belief in an appropriate administrative proceeding or in the adjudication of a petition for return under CR §10-615(d)(2).

(3) Denial of a petition for return of an animal under CR §10-615(d)(2) affirms the right of the humane society to take *temporary possession* of the animal; it does not vest the humane society with *ownership* of the animal. The right to possess the animal, however, reverts back to the owner when possession by the humane society is no longer necessary to protect the animal from cruelty or necessary for the health of the animal.

What do these holdings mean for Mr. Rohrer's animals, to the extent they are still in the Humane Society's custody?[42] Because the Humane Society's invocation of CR §10-615 was not defective due to its timing or the fact that the animals were in State custody at the time it was invoked, Mr. Rohrer was not entitled to return of the animals for an alleged failure by the Humane Society to comply with CR §10-615 at the time the Humane Society provided notice to him. On the other hand, the denial of the petition for return of the animals did not eliminate Mr. Rohrer's ownership interest in the animals. It may be that

---

[42] At oral argument we were advised that some of the goats had run away, that some animals had been sold by the Humane Society following the criminal trial until halted by the District Court's order on September 1, 2015, and that some animals were subsequently returned to Mr. Rohrer under an interlocutory order in the replevin case. There apparently remain unresolved issues in that case concerning Mr. Rohrer's entitlement to proceeds of the sales of animals and liability for the expenses of the animals' care.

possession of the animals by the Humane Society is no longer "necessary to protect the animal from cruelty" or "necessary for the health of the animal." But that issue is not before us.

In the context of this proceeding, we will remand the case to the Circuit Court with instructions to remand the case to the District Court so that the District Court may consider whether the change in circumstances since its initial decision – that is, the dismissal or acquittal of the vast majority of the criminal charges against Mr. Rohrer, the release of the animals from seizure under the search warrant, and the condition of Mr. Rohrer's probation that requires him to implement a farm management plan overseen by the Humane Society, and other relevant circumstances – merit a different disposition of his petition for return of the animals. We leave it to the judgment of the Circuit Court whether to continue the stay of Mr. Rohrer's pending replevin action and to ultimately consolidate the two proceedings to resolve issues of possession and title to the animals.

> **PURSUANT TO MARYLAND RULE 8-604(D), CASE REMANDED TO THE CIRCUIT COURT FOR WASHINGTON COUNTY WITH DIRECTION TO REMAND THE CASE TO THE DISTRICT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**